STATE OF MAINE                          BUSINESS & CONSUMER COURT
CUMBERLAND, ss.                         CIVIL ACTION
                                        DOCKET NO. BCD-CV-2018-00027


FREDERIC J. POOR, et al.,            )
                                     )
            Plaintiffs,              )
                                     )          ORDER DENYING
                                     )          DEFENDANT ALTHEA
      v.                             )          LATADY'S MOTION FOR
                                     )          SUMMARY JUDGMENT
                                     )
ROBERT KENNETH LINDELL, JR.,         )
et al.,                              )
                                     )
            Defendants.              )


## BACKGROUND

Before the Court is the Motion for Summary Judgment filed by Defendant Althea Latady

(f/k/a Althea Lindell) in the above-captioned matter (the "Motion"). For the reasons discussed

below, the Motion is DENIED.

## LEGAL STANDARD

Summary judgment is appropriate when the parties' statements of material facts and the

portions of the record referenced therein "disclose no genuine issues of material fact and reveal

that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12,

¶ 11, 915 A.2d 400 (citing M.R. Civ. P. 56(c)). "A material fact is one that can affect the outcome

of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose

between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME

103, ¶ 11, 48 A.3d 774 (quoting *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d

773). The Court must view the record facts in the light most favorable to the non-moving party

and must draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME

1

47, ¶ 21, 969 A.2d 897 (citations omitted); *Levis v. Konitzky*, 2016 ME 167, ¶ 20, 151 A.3d 20.

When the defendant is the moving party, it must establish that there is no genuine dispute of fact and that the undisputed facts would entitle it to judgment as a matter of law. *Diviney v. Univ. of Me. Sys.*, 2017 ME 56, ¶ 14, 158 A.3d 5. To withstand a defendant's motion for summary judgment, the plaintiff must in turn establish a prima facie case for each element of their cause of action. *Watt*, 2009 ME 47, ¶ 21, 969 A.2d 897 (citations omitted). If they do not present sufficient evidence on the essential elements, then the defendant is entitled to a summary judgment. *Id.*

## FACTS

For the limited purpose of deciding Latady's Motion, resolving all inferences in favor of the Plaintiffs, the record demonstrates the following genuine issues of material fact.

Latady married Lindell during 1991; they have three children together. (Def.'s S.M.F. ¶ 1; Pls.' S.M.F. ¶¶ 3-4.) Lindell worked as an investment advisor throughout their marriage. (Def.'s S.M.F. ¶ 4.) Latady knew that Lindell was sanctioned by securities regulators for violations he committed during 2001, and during 2009 or 2010. (Pls.' S.M.F. ¶ 4.) Lindell did not keep the sanctions or related investigations secret from Latady. (Pls.' S.M.F. ¶ 5.) Sometime during early 2017, Latady learned that Lindell was investigated and criminally charged for stealing funds from Plaintiffs' trusts. (Def.'s S.M.F. ¶ 10.)

A Senior Investigator for the Office of Maine Securities conducted the investigation involving Lindell. (Pls.' S.M.F. ¶ 43.) Her investigation revealed that Lindell stole millions of dollars, including from Plaintiffs' trusts, and that Lindell spent the money for his personal use and that of his family's.[1] (Pls.' S.M.F. ¶ 44.) On March 1, 2017, Lindell was indicted on one count of

---

[1] Plaintiffs are the beneficiary and trustee, respectively, to the estate of Phyllis J. Poor and trusts established thereby: the Frederic J. Poor Special Needs Trust, the Frederic J. Poor Trust Dated August 20, 2004 (the "2004 Trust"), and The Grandchildren's Trust. (Def.'s Mot. Summ. J. 1.) In total, Lindell expended over $1,500,000 from Phyllis Poor's estate and personal accounts for his and his family's benefit. (Pls.' S.M.F.

theft by unauthorized taking or transfer and one count of securities violations. (Pls.' S.M.F. ¶ 45.)

Latady filed for a divorce during January of 2018, and she began cooperating with the Maine Attorney General's investigation into Lindell. (Def.'s S.M.F. ¶ 15.) The divorce finalized during October or November of 2018. (Def.'s S.M.F. ¶ 31; Pls.' S.M.F. ¶ 62.) Plaintiffs filed their amended complaint naming Latady as a defendant in this civil matter on January 23, 2019. (Def.'s S.M.F. ¶ 17.) Plaintiffs allege that Latady has not repaid to Plaintiffs monies that were paid to her from their trusts and other accounts. (Pls.' S.M.F. ¶ 76.) Plaintiffs seek compensatory and punitive damages from Latady in connection with her marriage to Lindell and her concomitant access to and enjoyment of the following accounts and assets, the transactions related to them, and the proceeds therefrom.

## I.     The Frankfort and Cloverdale Properties

After their marriage, during 1992 Lindell and Latady purchased a home together in Frankfort, Maine (the "Frankfort Property"). (Def.'s S.M.F. ¶ 2; Pls.' S.M.F. ¶ 57.) They moved to California during or around 2014 after Lindell was sanctioned again by securities regulators. (Def.'s S.M.F. ¶ 4.) There, they began living in a home in Cloverdale, California, at 1850 Trimble Lane (the "Cloverdale Property"), which Lindell purchased as an investment for the Plaintiffs' trusts that he managed. (Def.'s S.M.F. ¶ 7; Pls.' S.M.F. ¶ 21.) Latady was aware that Lindell withdrew the purchase money from Plaintiffs' trust funds. (Pls.' S.M.F. ¶ 23.) According to Latady, Lindell told Latady that in lieu of him charging Plaintiffs' a substantial fee, as he was permitted to do, they could live rent-free at the Cloverdale Property. (Def.'s S.M.F. ¶ 9.) Latady lived with Lindell at the Cloverdale Property from 2014 through December of 2017. (Pls.' S.M.F. ¶ 21.)

---

¶ 49.) After Phyllis Poor's death, Lindell deposited over $1,700,000 into accounts held by the 2004 Trust. (Pls.' S.M.F. 50.) Lindell personally spent over $1,650,000 from those funds. (Pls.' S.M.F. ¶ 51.)

Lindell and Latady made substantial renovations to the Cloverdale Property before they moved in. (Def.'s S.M.F. ¶ 8; Pls.' S.M.F. ¶ 26.) The renovations included landscaping and installation of irrigation, plantings, raised beds, a walkway, and construction of a small vineyard. (Def.'s S.M.F. ¶ 8; Pls.' S.M.F. ¶ 29.) Latady provided her input into the renovations to the home's flooring, cabinetry, and countertops. (Pls.' S.M.F. ¶ 27.) She also helped select a new sound system, which cost approximately $30,000. (Pls.' S.M.F. ¶ 28.)

These improvements were made using funds in an amount exceeding $400,000 withdrawn from the 2004 Trust. (Def.'s S.M.F. ¶ 8; Pls.' S.M.F. ¶ 24.) Latady personally neither coordinated nor contributed payment for any of the renovations. (Pls.' S.M.F. ¶ 26.) The renovations were completed by the time Latady and Lindell moved in. (Pls.' S.M.F. ¶ 25.)

Latady eventually moved out of the Cloverdale Property during December of 2017.[2] (Pls.' S.M.F. ¶¶ 69-70.) Neither she nor Lindell paid rent to the Plaintiffs for the time they lived at the Cloverdale Property. (Pls.' S.M.F. ¶ 76.)

On May 5, 2018, the Court granted an order of attachment in the amount of $3,000,000 against Lindell in the present action, which was recorded in the Waldo County Registry of Deeds and encumbers the Frankfort Property. (Def.'s S.M.F. ¶ 18; Pls.' S.M.F. ¶ 58.) Latady first learned about the attachment and encumbrance to the Frankfort Property on September 14, 2018. (Pls.' S.M.F. ¶ 58.)

After his indictment, on September 17, 2018, Lindell conveyed his interest in the Frankfort Property to Latady via a quitclaim deed. (Def.'s S.M.F. ¶ 20; Pls.' S.M.F. ¶ 61.) After the couple divorced later that year, Latady was awarded the Frankfort Property and other marital assets. (Def.'s S.M.F. ¶ 31; Pls.' S.M.F. ¶ 63.) Latady continues to own the Frankfort Property, which she

---

[2] The parties offer alternative explanations for why Latady left the California and the Cloverdale Property. (Def.'s S.M.F. ¶14; Pls.' S.M.F. ¶ 69.) However, that dispute is not material to deciding the Motion.

rents to tenants.[3] (Def.'s S.M.F. ¶ 34; Pls.' S.M.F. ¶ 64.)

## II.     Bank Accounts & Deposits

In California, Lindell rented an office, continued working as an investment advisor and managed investments for Plaintiffs' trusts. (Def.'s S.M.F. ¶ 5.) Latady worked full-time in various roles within the wine industry. (Def.'s S.M.F. ¶ 6; Pls.' S.M.F. ¶ 8.) She earned between $18 and $26 per hour for her work. (Pls.' S.M.F. ¶ 9.)

Throughout their marriage, Lindell and Latady shared joint bank accounts. (Pls.' S.M.F. ¶ 6.) However, Latady also maintained her own personal bank account separately from their joint accounts. (Pls.' S.M.F. ¶ 7.) Latady deposited all of her earnings from her work for her California employers into her separate, personal bank account. (Pls.' S.M.F. ¶ 10.) During their time together in California, Latady and Lindell also shared a joint Exchange Bank account, and possibly one other Virtual Bank account. (Pls.' S.M.F. ¶ 16.)

While they lived in California, Latady was responsible only for paying for her and Lindell's family's healthcare needs, and for infrequent and miscellaneous expenses like groceries or for activities for their children. (Def.'s S.M.F. ¶ 25; Pls.' S.M.F. ¶ 11.) She also paid her tuition for a certificate course, purchased wine, and made some payments on her credit card. (Pls.' S.M.F. ¶ 11.) However, she wasn't responsible for utilities or any other of the family's expenses. (Pls.' S.M.F. ¶ 12.) Her unspent income went into her savings. (Pls.' S.M.F. ¶ 13.)

Apart from Latady's income, the Office of Maine Securities' investigation revealed the following deposits into Lindell and Latady's joint bank accounts or Latady's personal bank account:

---

[3] The Frankfort Property would have a market value of about $250,000 if it were in good condition, but it needs repairs that would cost approximately $35,000, and it is encumbered by a mortgage for the approximate amount of $110,000 as well as a home equity loan for the approximate amount of $25,000. Thus, present equity in the property is valued at approximately $80,000. (Def.'s S.M.F. ¶ 3.)

- During the period from 2014 through 2016, $5,000 was disbursed into Lindell and Latady's joint Sabadell/Virtual Bank account from the 2004 Trust. (Pls.' S.M.F. ¶ 55.)

- During the period from 2014 through 2016, $60,100 was disbursed from the 2004 Trust and deposited into Latady and Lindell's joint Exchange Bank account. (Pls.' S.M.F. ¶ 56.)

- A check in the amount of $1,120, dated February 24, 2017, was paid to "Althea Lindell" from a bank account for the 2004 Trust. (Pls.' S.M.F. ¶ 42.)

Latady also had her own accounts and investments. (Pls.' S.M.F. ¶ 14.) Lindell agreed to invest $100,000 that Latady had inherited for her. (Def.'s S.M.F. ¶ 11.) Lindell admitted to spending nearly all of Latady's savings, including the funds that she inherited, without her knowledge or permission. (Def.'s S.M.F. ¶¶ 12-13; Pl.'s ¶ 67.) Latady and Lindell's divorce judgment includes specific findings that (1) Lindell spent Latady's inheritance, and (2) he conveyed to Latady his interest in the Frankfort Property to offset the amount he owed to her as a consequence of spending her inheritance. (Def.'s S.M.F. ¶ 33.)

## III.    Barclays US L.L. Bean Credit Card

Latady also had a Barclays US L.L. Bean credit card in her own name, which she mostly paid off herself but which Lindell sometimes paid for her. (Pls.' S.M.F. ¶¶ 17, 19-20.) Lindell made payments towards this credit card on two occasions when the couple lived in California because Latady was trying to put away into savings as much of her income as possible. (Pls.' S.M.F. ¶ 18.) The Office of Maine Securities' investigation revealed over $24,000 was paid towards Latady's L.L. Bean credit card from the 2004 Trust and other sources. (Pls.' S.M.F. ¶¶ 52-53.) Notably, the investigation recorded one payment on June 12, 2012, in the amount of $9,000 from Phyllis Poor's personal account made by Lindell as Power of Attorney. (Pls.' S.M.F. ¶ 47.)

## IV.    Mortgage on the Cloverdale Property & Proceeds

During February of 2017, Lindell borrowed a mortgage on the Cloverdale Property in the amount of $450,000. (Pls.' S.M.F. ¶¶ 30-31.) Latady claims that Lindell told her that he purposed

the borrowed funds for the development of a vineyard at the Cloverdale Property. (Pls.' S.M.F. ¶ 32.) However, Lindell and Latady generally used the Cloverdale Property as a typical, residential family home, and not as a vineyard. (Pls.' S.M.F. ¶ 33.)

To obtain the mortgage loan, Lindell provided the lender with a lease agreement, dated June 20, 2014, that stated that the 2004 Trust was leasing the Cloverdale Property to Latady for the amount of $3,500 per month. (Pls.' S.M.F. ¶ 34.) The lease agreement purports to contain each of Latady's and Lindell's signatures. (Pls.' S.M.F. ¶ 35.) The dates next to the signatures of Lindell and Latady appear to be written by two different individuals – they do not match. (Pls.' S.M.F. ¶ 36.) However, Latady claims that she did not sign the lease agreement. (Pls.' S.M.F. ¶ 36.)

The proceeds from the mortgage on the Cloverdale Property were deposited into an Exchange Bank checking account for the 2004 Trust, with Lindell named as the trustee. (Pls.' S.M.F. ¶ 37.) On February 28, 2017, approximately $130,000 of the funds were immediately transferred to Latady and Lindell's joint bank account. (Pls.' S.M.F. ¶ 38.) $71,000 of these funds were then used to make credit card payments. (Pls.' S.M.F. ¶ 39.)

V.    **Miscellaneous Disbursements From Trust Funds**

As part of its investigation, the Office of Maine Securities created summaries of bank, financial, and business records relating to Lindell's criminal case. (Pls.' S.M.F. ¶ 46.) The investigation recorded the following disbursements made by Lindell from Plaintiffs' trust funds and other accounts:

- On May 10, 2012, a payment was made to John Bapst High School towards high school tuition for Latady and Lindell's son. (Pls.' S.M.F. ¶ 48.)

- Payments from the 2004 Trust to Boston University in the amount of $13,500 towards the tuition for Lindell's and Latady's child. (Pls.' S.M.F. ¶ 54.)

- On March 3, 2017, $17,189.27 was paid from the bank account for the 2004 Trust to Bank of America. (Pls.' S.M.F. ¶¶ 39, 40.) The payment was labeled "Bank of America Online Pmt, Lindell, Althea $17,189.27." (Pls.' S.M.F. ¶ 39.)

7

- On March 3, 2017, a mortgage payment on the Frankfort Property in the amount of $1,448.58 was made from the bank account for the 2004 Trust. (Pls.' S.M.F. ¶ 41.)

- Numerous cash withdrawals were made and checks written from the bank account for the 2004 Trust without an accompanying memo. (Pls.' S.M.F. ¶ 52.)

**DISCUSSION**

In their Motion, Plaintiffs stipulate to dismissal of the following counts as to Latady: Count II, breach of fiduciary duty; Count III, fraud; Count VIII, tortious interference with an expectancy; Count X, civil conspiracy; and Count XI, intentional infliction of emotional distress. Latady's Motion requests a summary judgment on Plaintiffs' Count I, conversion; Count V, unjust enrichment; Count VI, punitive damages as to all causes of action; and Count IX, fraudulent conveyance. Each issue is discussed separately below.

## I. Conversion (Count I)

Conversion requires an actual and substantial interference with a party's rights to their property. *Est. of Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 17, 157 A.3d 769 (citation omitted). The elements a plaintiff must prove to establish their claim for conversion are: (1) that the plaintiff has an interest in the property at issue; (2) that they had the right to possession at the time of the defendant's alleged conversion; and (3) that the plaintiff made a demand for the property's return, which was denied. *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798. (citation omitted). However, the plaintiff need only make a demand if the defendant took the property rightfully, hence "where the circumstances show that a demand would be useless, a demand is unnecessary." *Id.* (citation omitted). Further, the defendant need not intend to undertake any wrongdoing; they must merely act with an intent to exercise dominion or control over the plaintiff's property that is in actuality inconsistent with the plaintiff's rights. *Mitchell v. Allstate Ins. Co.*, 2011 ME 133, ¶ 15, 36 A.3d 876 (citation omitted). "A mistake of fact or law is no defense." *Id.* (citation omitted).

In support of their conversion claim, Plaintiffs assert that Latady possessed and received the following funds, to which Plaintiffs had a property interest:

1. Over $24,000 paid towards Latady's Barclays US L.L. Bean credit card from the 2004 Trust and other sources;

2. The $17,189.27 payment by the 2004 Trust to Bank of America;

3. The mortgage payment for the Frankfort Property in the amount of $1,448.58, paid from the 2004 Trust;

4. The $1,120 check paid to Latady by the 2004 Trust;

5. The $5,000 transferred into Latady and Lindell's joint Sabadell/Virtual Bank account from the 2004 Trust; and

6. The $60,100 transferred into Latady and Lindell's joint Exchange Bank account from the 2004 Trust.[4]

The parties do not dispute Plaintiffs' property interest in these funds or their right to possess them. Latady, however, argues that she cannot be liable for conversion as a matter of law because she did not intentionally exercise dominion or control over Plaintiffs' property where Lindell, and not herself, was the person who improperly disbursed the funds from Plaintiffs' trust accounts.[5] (Def.'s Mot. Summ. J. 4.) In the Court's view, this argument is unpersuasive in light of the hornbook rule that a defendant's use of another's property as if they own it "is conversion." Simmons, Zillman & Furbish, *Maine Tort Law* § 6.05 (2018 ed. 2017 & Supp. 2022). Courts may properly find that a defendant exercised the requisite dominion or control over a plaintiff's property "by simply possessing" it. *Mitchell*, 2011 ME 133, ¶ 18, 36 A.3d 876 (citations omitted).[6]

---

[4] The total amount of funds subject to Plaintiffs' conversion claim is $109,150.92. (Pls.' Opp'n to Def.'s Mot. Summ. J. 11.)

[5] Because neither Lindell nor Latady took Plaintiffs' money rightfully, the requirement that Plaintiffs prove they made a demand for return of their property that was rejected by Latady does not apply.

[6] The Court is not aware whether the Law Court has considered a case in which a plaintiff asserts a conversion claim against a passive spouse who shared bank accounts with an embezzling spouse. Neither party briefed such a case. Other jurisdictions that considered such cases hold that the passive spouse, irrespective of the absence of fault, may be liable for the conversion when there is evidence that (1) they used the plaintiff's property (i.e., spent funds) and (2) they knew or reasonably should have known that

9

Here, viewing the record facts in the light most favorable to Plaintiffs, Plaintiffs have raised genuine issues of material fact concerning whether Latady exercised dominion or control over Plaintiffs' funds that were paid on her behalf to (1) Barclays US and to (2) Bank of America, as well as to (3) the mortgage payment for the Frankfort Property. Those funds were used to pay Latady's debts, and she can be said to have used them as the owner. Likewise, she was in possession of (4) the funds paid to her by check and (5-6) deposited into the joint accounts for which she was an accountholder.

Latady also argues that Plaintiffs never made, and she never denied, a demand to return Plaintiffs' property to them. (Def.'s Mot. Summ. J. 4.) Again, however, a demand is only unnecessary when the defendant rightfully took possession of the plaintiff's property. *Withers*, 1998 ME 164, ¶ 7, 714 A.2d 798. (citation omitted). Lindell may have rightfully taken possession of the converted funds in his fiduciary capacity as trustee and Power of Attorney. However, Latady only gained possession of them as a result of Lindell's misappropriation. Hence, a demand by Plaintiffs directed to Latady was not required in this case to generate a viable conversion claim.

For these reasons, the Court denies Latady's motion for a summary judgment on Plaintiffs' conversion claim.

## II. Unjust Enrichment (Count V)

---

they were receiving and spending money that was not rightfully theirs to spend. *See, e.g., H & M Enters. v. Murray*, No. M1999-02073-COA-R3-CV, 2002 Tenn. App. LEXIS 261, at *12-13 (Apr. 17, 2002) (citing *Colonia Ins. Co. v. City Nat'l Bank*, 988 F. Supp. 1242, 1252 (W.D. Ark. 1997)); *Fed. Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 517-22 (E.D. Va. May 30, 2001) ("a person to whom or for whose knowing benefit converted funds are knowingly disbursed exercises dominion and control over the funds by appropriating the funds for her own benefit"); *Zell & Ettinger v. Berglas*, 690 N.Y.S.2d 721, 721 (N.Y. App. Div. 1999)); *but see Ctr. for Pain Control v. McCall*, No. 2-11-0649, 2012 Ill. App. Unpub. LEXIS 642, at *27-28 (Ill. App. Ct. Mar. 23, 2012). The Court finds that, viewing the record evidence in the light most favorable to them, Plaintiffs raised a genuine issue of material fact under this standard. As discussed below, Plaintiffs raised a fact dispute regarding Latady's "use" of the funds. The record evidence is otherwise sufficient to support a finding that she knew or reasonably should have known that the funds deposited into her and Lindell's joint bank accounts in four and five-figure amounts, after Lindell was sanctioned for securities violations on more than one occasion, were not rightfully hers.

To prove their claim for unjust enrichment, a plaintiff must establish that (1) a benefit was conferred upon the defendant by the plaintiff, (2) that the defendant had appreciation or knowledge thereof, and (3) that the defendant's acceptance or retention of the benefit was under circumstances that make it inequitable for them to accept or retain it without payment of its value. *U.S. Bank v. Thomes*, 2013 ME 60, ¶ 14, 69 A.3d 411 (citation omitted). These elements are construed as issues of fact. *See Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 14, 760 A.2d 1041.

In addition to Plaintiffs' funds allegedly converted by Latady in the amount of $109,150.92, Plaintiffs allege Latady was unjustly enriched by:

1.  $13,500 of Plaintiffs' funds used towards Latady's son's college tuition;

2.  Rent-free occupancy of the Cloverdale Property from 2014 through 2017, quantified according to the rental's fair market value during the years at issue;

3.  Renovations to the Cloverdale Property, valued according to the purchase price.

(Pls.' Opp'n to Def.'s Mot. Summ. J. 14.)

First, the Court cannot definitively say that, as a matter of law, Plaintiffs did not confer the benefits upon Latady. It is true that Plaintiffs did not confer any benefit upon her themselves, directly. However, the record evidence demonstrates that Lindell's bestowal of benefits upon himself and Latady occurred when he was dutybound as a fiduciary to Plaintiffs in his role as trustee, wherein he was authorized to exercise Plaintiffs' rights as owners of the trust property. *See* 18-B M.R.S. §§ 815-816 (2022). Moreover, courts routinely permit claims for unjust enrichment made against innocent recipients of property or bona fide transferees who are not purchasers for value.[7] There are no facts to permit an inference that Latady gave value to Plaintiffs for the benefits

---

[7] In other jurisdictions the following facts, if found, provide an adequate basis to hold a passive spouse liable for unjust enrichment in relation to the consumption or enjoyment of funds fraudulently obtained by an embezzling spouse: (1) the funds were fraudulently obtained by the embezzling spouse, (2) consumed or enjoyed by the passive spouse, (3) to the plaintiff's detriment, (4) the passive spouse gave no valuable consideration for the funds, and (5) the passive spouse had no legal claim to the funds. Restatement (First)

11

at issue.

Next, viewing the record evidence in the light most favorable to Plaintiffs, there is a fact dispute regarding whether, as a co-accountholder, co-tenant, or a co-payor Latady had appreciation or knowledge of these benefits. Lastly, in consideration of Lindell's misconduct in the operative events underlying this suit, there is a genuine issue of material fact regarding whether Latady's acceptance or retention of the above-listed benefits was under circumstances that made it inequitable for her to accept or retain them without payment of value.

In consideration of these disputed facts in the summary judgment record, the Court denies Latady's Motion concerning Plaintiffs' unjust enrichment claim.

### III. Fraudulent Conveyance (Count IX)

The Uniform Fraudulent Transfer Act ("MUFTA"), as adopted by the Maine State Legislature, provides that a transfer made or obligation incurred by a debtor may be fraudulent as to a creditor, no matter whether the creditor's claim arose before or after the transfer was made or the obligation was incurred. 14 M.R.S. § 3575(1) (2022). Such a transfer or obligation is "fraudulent" if the debtor made the transfer or incurred the obligation with "actual intent to hinder, delay or defraud any creditor of the debtor." *Id.* § 3575(1)(A). In determining a party's actual intent, courts may consider various factors, including, but not limited to, whether "[t]he transfer or obligation was to an insider," and whether "[t]he transfer occurred shortly before or shortly after

---

of Restitution § 123 (Am. Law Inst. 1937, updated through 2016); *see McCall*, 2012 Ill. App. Unpub. LEXIS 642, at *24 (citing *Douglass v. Wones*, 458 N.E.2d 514, 521-22 (Ill. App. Ct. 1984)); *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 568-74 (Md. Ct. Spec. App. Mar. 13, 2007) ("the dispositive question is whether … the defendant transferee, paid value for the funds transferred to her by … the culpable third party") (discussing cases); *Williams v. Aloisi*, No. 6:01-cv-470-Orl-31KRS, 2002 U.S. Dis. LEXIS 410, at *683-87 (M.D. Fla. Jan 15, 2002) (discussing cases); *Westhoff v. Kerr S.S. Co.*, 530 A.2d 352, 355-56 (N.J. Super. Ct. App. Div. Aug. 13, 1987); *In re Marriage of Allen*, 724 P.2d 651, 659-60 (Colo. 1986) (equating the passive spouse with a donee or gratuitous transferee, and permitting establishment of a constructive trust or equitable lien upon embezzled property in their possession).

a substantial debt was incurred." *Id.* § 3575(2)(A), (J). When the debtor is an individual, an "insider" may be "[a] relative of the debtor." 14 M.R.S. § 3572(7)(A)(1) (2022). An individual's "spouse" is their "relative." *Id.* § 3572(11).

Plaintiffs' fraudulent conveyance claim against Latady is made with respect to the Frankfort Property, which Lindell conveyed to Latady by quitclaim deed as contemplated by their divorce settlement agreement. Lindell's conveyance of his interest in the Frankfort Property occurred during September of 2018 – after his March 2017 indictment, and several months after the Court granted Plaintiffs' attachment against Lindell in the amount of $3,000,000 during May of 2018.

There are genuine issues of material fact with respect to whether this transfer is actionable under the MUFTA. Construing the record evidence in favor of Plaintiffs, a reasonable fact-finder could conclude therefrom that Lindell's conveyance of the Frankfort Property as attachment-debtor was made with "actual intent to hinder, delay or defraud" the Plaintiffs as attachment-creditors. The conveyance was made to Latady on or around September 17, 2018, when Latady was a "relative" and "insider" within the meaning of the MUFTA. Also, the transfer was made after Lindell was noticed by the attachment granted to the Plaintiffs that he could be liable for a substantial "debt." Because the Court concludes that the summary judgment record evidence, viewed in the light most favorable to Plaintiffs, is sufficient to support a prima facie showing of a fraudulent conveyance under section 3575(1)(A) of the MUFTA, the Court does not reach the question of whether the record supports a prima facie showing under section 3575(1)(B). *See Mitsubishi Caterpillar Forklift Am., Inc. v. Superior Serv. Assocs.*, 81 F. Supp. 2d 101, 114 (D. Me. 1999).

Latady makes two arguments in support of her Motion. First, she argues that the transfer

in question is not voidable under the MUFTA because she, as transferee, took Lindell's interest in the Frankfort Property in good faith and for a reasonable equivalent value. (Def.'s Reply to Pls.' Opp'n to Def.'s Mot. Summ. J. 6-7.) This is because, according to Latady, she accepted Lindell's interest in the Frankfort Property as "a reasonable equivalent value" to offset the value of funds that she inherited and that Lindell allegedly stole from her. Latady's first argument is unavailing to her, where, as noted above, the Court does not reach Plaintiffs' MUFTA claim-in-the-alternative under section 3575(1)(B). Section 3575(1)(A) requires no showing that Lindell as debtor made the transfer without receiving a reasonably equivalent value therefore.

Second, Latady argues that the conveyance by quitclaim deed is a voidable transfer, since Lindell's property interest in the Frankfort Property was encumbered by Plaintiffs' attachment at the time of the deed's execution. (*Id.* at 7.) In support of her position, Latady cites to section 3577, subsection (1) of the MUFTA, which provides that a transfer is made with respect to an asset that is real property "when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee." 14 M.R.S. § 3577(1)(A) (2022). Irrespective of this limitation, the MUFTA includes a catchall provision, which provides that "[i]f applicable law does not permit the transfer to be perfected as provided in [section 3577, subsection (1)], the transfer is made when it becomes effective between the debtor and the transferee." *Id.* § 3577(3). Here, the transfer became effective upon the recordation and delivery of the quitclaim deed by which Lindell conveyed his interest in the Frankfort Property to Latady.

Finally, Latady argues that the transfer in question did not actually defraud Plaintiffs of any claim they might have had to Lindell's interest in the Frankfort Property. She claims that the home has not been sold, and the transfer is accordingly voidable and the value transferred is

recoverable. *See* 14 M.R.S. § 3578(1) (2022). However, a money judgment to recover for the value of the asset transferred may be enforced by the creditor against the first transferee of the asset. 14 M.R.S. § 3579(2)(A) (2022). Otherwise, section 3578 presents various remedies that a creditor may, or may not, elect to pursue. The statute does not contain any express language indicating that these remedies are exclusive relative to one another. *See Klingerman v. SOL Corp. of Maine*, 505 A.2d 474, 477 (Me. 1986).[8]

The Court is not persuaded by Latady's arguments in support of her Motion with respect to Plaintiffs' Count IX. The Court declines to enter a summary judgment for Latady on Plaintiffs' fraudulent concealment claim.

## IV.    Punitive Damages (Plaintiffs' Count VI)

In Maine, punitive damages are available to a plaintiff only to the extent that the defendant is shown by clear and convincing evidence to have acted with malice.[9] *Tuttle v. Raymond*, 494 A.2d 1353, 1361, 1363 (Me. 1985). Malice exists when the defendant's conduct is motivated by ill-will towards the plaintiff, or when the conduct is so outrageous that malice towards the plaintiff ought to be implied. *Id.* However, such malice cannot be established by a defendant's mere reckless disregard of the circumstances underlying the alleged wrong. *Id.*

Here, the Court finds that the record evidence, viewed in the light most favorable to Plaintiffs, is sufficient to generate a genuine issue of material fact concerning constructive malice. There are fact disputes concerning Latady's knowledge of Lindell's fraudulent treatment of

---

[8] The MUFTA's provisions are applied and construed to effectuate its general purpose to make uniform the law with respect to its subject matter. 14 M.R.S. § 3582 (2022). Other jurisdictions that adopted the Uniform Fraudulent Transfer Act do not construe section 3578 to provide remedies that are mutually exclusive. *E.g.,* Tenn. Code Ann. § 66-3-308(a), cmt. 1 (2022) ("The remedies specified in this section are not exclusive."). The Court adopts this construction of section 3578 for the purpose of deciding Latady's Motion.

[9] The "clear and convincing standard" is satisfied when the fact-finder is persuaded that the evidence was proved to a high probability. *Dubois v. Madison Paper Co.*, 2002 ME 1, ¶ 11, 795 A.2d 696.

Plaintiffs and dereliction of his fiduciary duties, and whether she knowingly accepted, used and enjoyed Plaintiffs' funds fraudulently obtained by Lindell. Because, based on the record before the Court on Latady's Motion, a reasonable fact-finder could conclude that she knew of the circumstances underlying Lindell's fraud, the Court cannot grant a summary judgment to Lindell on Plaintiffs' claim for punitive damages.

## CONCLUSION

For the foregoing reasons, Defendant Althea Latady's Motion for Summary Judgment is DENIED as to Plaintiffs' Counts I for conversion, Count V for unjust enrichment, Count VI for punitive damages, and Count IX for fraudulent conveyance.

So ordered.

The Clerk is instructed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

So Ordered.

Dated: **05/11/2023**

Michael A. Duddy, Judge
Business & Consumer Court

Entered on the docket:  05/11/2023

16

STATE OF MAINE                          BUSINESS & CONSUMER DOCKET
CUMBERLAND, ss.                         LOCATION:  PORTLAND
                                        DOCKET NO. BCD-CV-2018-00027


FREDERIC J. POOR,          )
et al.,                    )
                           )
            Plaintiffs     )
                           )
v.                         )            ORDER SUSTAINING BHTS'S OBJECTION
                           )            TO DISCOVERY ON THE GROUNDS OF
ROBERT K. LINDELL, JR.,    )            ATTORNEY-CLIENT PRIVILEGE
et al.,                    )
            Defendants     )


        Plaintiffs Frederic Poor and the Frederic J. Poor Special Needs Trust

("Plaintiffs" or together the "Trust") are pursuing discovery of information against

Defendant Bar Harbor Trust Services ("BHTS"), which BHTS maintains is protected

by the attorney-client privilege. *See* M.R. Evid. 502. On January 27, 2022, pursuant to

M.R. Civ. P. 26(g), the Court held a discovery conference. Among other issues, the

discovery dispute raises the question of whether the Court can or should recognize a

fiduciary exception to the attorney-client privilege. Concluding that the dispute

presents complicated issues of privilege law, the Court asked counsel to brief the

issues. The briefing schedule was completed on April 21, 2022. For the reasons

discussed below, the Court sustains BHTS' objections on the grounds of the attorney-

client privilege.[1]

                              BACKGROUND

---

[1] Pursuant to M.R. Civ. P. 7(b)(7), the Court provides this Order without the need for further oral argument.

1

At all times relevant to this discussion, which the Trust agrees is the timeframe prior to July 1, 2018, BHTS served as administrative trustee of the Trust. The Trust was represented by its legal counsel, the law firm of Pierce Atwood. The Trust alleges that BHTS was negligent and breached its fiduciary duties and improperly used Trust funds to pay Pierce Atwood. As part of its discovery against BHTS, the Trust served the following discovery requests:

> Request No. 7: All documents consisting of or relating to any communications between BHTS, on the one hand, and Pierce Atwood on the other hand relating to any legal services performed by Pierce Atwood for the benefit of the Frederic J. Poor trust or any other Plaintiff.
>
> Request No. 20: All documents relating to legal fees paid to Pierce Atwood from the Frederic J. Poor SNT, including but not limited to any client engagement letter and detailed invoices.
>
> Request No. 21: All documents relating to legal services performed by Pierce Atwood for the benefit of the Frederic J. Poor SNT including but not limited to the entire client file, any correspondence, notes, memoranda, attorney work product, internal communications, and invoices.
>
> Interrogatory No. 24: Identify all individuals who suggested that Frederic J. Poor's guardian sign a waiver.

In response to each of these discovery requests, BHTS objected on the grounds that the requests seek documents or information protected from disclosure by the attorney-client privilege. The legal question is whether communications and information relating to Pierce Atwood's representation of BHTS while the latter was serving as administrative trustee to the Trust is protected by the attorney-client privilege. The Court concludes that it is.

DISCUSSION

BHTS objects to the discovery requests on the grounds of attorney-client privilege. Plaintiffs opposes the objection on several grounds. They primarily argue

2

BHTS has not demonstrated that the privilege applies, because BHTS was acting as Poor's representative, the communications were not intended to be confidential, and BHTS has not demonstrated any exception applies. In the alternative, Plaintiffs argue BHTS has waived its privilege.

## I.     Existence of Attorney-Client Privilege

### A.  Overview

The attorney-client privilege is a fundamental protection for confidential communications between lawyer and client. *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981); *Harris Mgmt., Inc. v. Coulombe*, 2016 ME 166, ¶ 21, 151 A.3d 7. Its purpose is to encourage full disclosure by clients to their attorneys and thereby enable attorneys to provide informed advice. *Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 18, 742 A.2d 933. The protection extends only to communications, not facts, meaning a client cannot refuse to disclose relevant information within his or her knowledge just because such information was also stated to an attorney. *Upjohn Co.*, 449 U.S. at 396.

The privilege provides that a "client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of any confidential communication" between the client and the client's lawyer or between their representatives, among others. M.R. Evid. 502(b). A "client" is defined as a person, corporation, or other entity "[t]o whom a lawyer renders professional legal services, or who consults with a lawyer with a view toward obtaining professional legal services from the lawyer." M.R. Evid. 502(a)(1). A communication is "confidential" when "it is made to facilitate the provision of legal services to the client and is not intended to be disclosed to any third party other than those to who the client revealed

3

that information in the process of obtaining professional legal services." M.R. Evid. 502(a)(5). A client's "representative" is a person who has authority on behalf of a client to obtain professional legal services and act on advice rendered as part of those services. M.R. Evid. 502(a)(2). The party asserting the privilege has the initial burden and the party seeking to show an exception applies has the burden of proving the elements requisite for the exception exist. *Harris Mgmt., Inc.*, 2016 ME 166, ¶ 24, 151 A.3d 7.

### B. Arguments

According to BHTS, the attorney-client privilege applies to and protects communications between BHTS and Pierce Atwood, including those made prior to July 1, 2018, because BHTS had engaged Pierce Atwood for advice concerning its obligations to respond to requests for information about the Trust. As such, the argument goes, BHTS was Pierce Atwood's "client," in contrast to Poor, who was represented through his guardians by separate attorneys. BHTS's communications with Pierce Atwood were made to facilitate the latter's provision of legal services and neither party intended their contents to be revealed. Because of that purpose and intent, and because the contents were in fact not revealed to anyone outside Pierce Atwood, BHTS claims the communications were confidential.

Plaintiffs point to M.R. Evid. 502(c)(1)(D), which provides that a trustee or other agent authorized to act on behalf of a legal entity may claim attorney-client privilege in legal matters or in communicating with an attorney for the entity, as contemplating that a trustee is functionally the representative of the beneficiary in an attorney-client context. If BHTS was seeking legal advice in its capacity as

4

representative of the Trust and of Poor, argue Plaintiffs, then the "real" clients were the Plaintiffs, and they have a right to Pierce Atwood's communications. The fact that Plaintiffs had their own attorneys would not seem to render it impossible for Pierce Atwood to *also* serve them concerning different matters. Moreover, Plaintiffs argue that BHTS could not have reasonably expected the documents and information requested to be kept confidential from the beneficiaries of the Trust when the Will specifically provides that the trust's "books and records along with all trust documentation shall be available and open at all reasonable times to the inspection of the trust beneficiaries and their representative." Plaintiffs assert that communications with attorneys regarding trust matters should be considered "trust documentation." As such, according to Plaintiffs, BHTS was not the true client and the documents were not confidential, meaning BHTS cannot claim attorney-client privilege here.

*C. Analysis*

BHTS was clearly Pierce Atwood's client as of July 21, 2017, when it first engaged Pierce Atwood to advise it in relation to its role as administrative trustee for Poor's Trust. BHTS remained Pierce Atwood's client through July 1, 2018, the timeframe here under consideration. Plaintiffs' arguments that they were nevertheless the "true" clients of Pierce Atwood during this period are not convincing. Rule 502(c)(1)(D) does not make the beneficiary or the Trust the functional equivalent of the trustee for purposes of the privilege. Pierce Atwood was not the Trust's law firm, it was BHTS's law firm. The parties do not cite Maine law specifically on point, but in *Symmons v. O'Keefe*, the Massachusetts Supreme Judicial Court held

5

that where a trustee engages a lawyer to provide opinions about the trustee's role, the trustee can invoke the attorney-client privilege against the trust beneficiaries to protect those opinions, despite the fact they concern the trust. 419 Mass. 288, 301 (1995). The rationale for this approach lies in the inherent potential for conflicting loyalties:

> In the course of administering a trust, a trustee may be required to make difficult decisions with regard to his or her duties to the beneficiaries. A trustee's attorney guides the trustee in this decision-making process. That the interests of the trustee and the interests of the beneficiaries may at times conflict cannot seriously be disputed. Should we decide that a trustee's attorney owes a duty not only to the trustee but also to the trust beneficiaries, conflicting loyalties could impermissibly interfere with the attorney's task of advising the trustee. This we refuse to do. . . .

> The plaintiffs argue that the interests of the trustees and the interests of the beneficiaries in the circumstances presented here do not differ, and thus, conflicting duties are not a concern. We disagree. Our decisions make clear that it is the potential for conflict that prevents the imposition of a duty on the [attorneys] to the trust beneficiaries.

*Spinner v. Nutt*, 417 Mass. 549, 553-54 (1994) (internal citations omitted). The Court finds these cases persuasive and concludes that a law firm retained by a trustee does not have an attorney-client relationship with the Trust or trust beneficiary from which duties or privileges may arise.

Pierce Atwood's legal services to BHTS related to the latter's duties and obligations as trustee. There is nothing in the record to indicate BHTS thought its communications would be revealed to Plaintiffs. Communications between BHTS and Pierce Atwood are not "trust documentation;" they are, if anything "trustee documentation." Poor and the Trust would tangentially benefit from this relationship if Pierce Atwood's advice enabled BHTS to properly administer the Trust, but the

6

advice was always targeted at and restricted to BHTS's interests, not those of the Plaintiffs. BHTS hired Pierce Atwood on its own behalf, not that of Plaintiffs, and can thus claim attorney-client privilege against the discovery attempts of Plaintiffs.

## II. Exceptions to the Attorney-Client Privilege

The Maine Rules of Evidence enumerate six areas of exception to attorney-client privilege:

i)  communications in furtherance of crime or fraud;
ii)  claimants though the same deceased client;
iii)  breach of duty by either lawyer or client;
iv)  document attested by lawyer;
v)  matter of common interest between joint clients;
vi)  public officer or agency.

M.R. Evid. 502(d). According to Plaintiffs, two of the exceptions are implicated here, along with an exception not explicitly recited in the Rule. For the reasons discussed below, the Court determines that none of the exceptions apply.

### A. Fiduciary Exception

Not included in the Maine Rules of Evidence is the so-called "fiduciary exception," whereby a trustee cannot shield from disclosure communications with the trustee's attorney regarding the trustee's duties owed to beneficiaries. *See Riggs Nat'l Bank v. Zimmer*, 355 A.2d 709 (Del. Ch. 1976). In *Riggs*, a Delaware court held that the trustee was not the "real" client of the attorney because the trustee was consulting about duties owed to beneficiaries and the intention of the communication was to aid said beneficiaries. *Id.* at 714. That court held that a policy of preserving full disclosure in a trustee-

7

beneficiary relationship is more important than protecting the trustee's confidence in an attorney for the trust. *Id.*

   i.  <u>Arguments</u>

BHTS argues that the modern trend across many states is not to recognize the common-law fiduciary exception and rather to maintain the traditional scope of the attorney-client privilege. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 171 n.3 (2011) (quoting A. Newman, G. Bogert & G. Bogert, Law of Trusts and Trustees § 962, p. 68 (3d ed. 2010)). BHTS cites numerous cases from a variety of states rejecting the fiduciary exception, including a decision by this Court (Murphy, J.) which expressly declined to adopt it. *See Gleichman v. Scarcelli*, No. BCD-CV-17-11, 2017 Me. Bus. & Consumer LEXIS 15, at *9 (June 30, 2017). BHTS also argues that this Court is not empowered to recognize a new exception because that power is reserved for the Supreme Judicial Court. 4 M.R.S. § 9-A ("The Supreme Judicial Court shall have the power and authority to prescribe, repeal, add to, amend or modify rules of evidence."). The Law Court has declined to recognize a new evidentiary privilege on appeal, stating it is only able to do so pursuant to its rule-making powers when sitting as the Supreme Judicial Court. *Citizens Commc'n Co. v. Attorney General*, 2007 ME 114, ¶ 14, 931 A.2d 503. Even if this Court did find it could add an exception to Rule 502, BHTS says it should not, first because of general policy considerations and second because in the instant case BHTS was Pierce Atwood's "real" client, not Poor. The fact that the Trust paid for the legal services Pierce Atwood provided to BHTS prior to July 1, 2018 is irrelevant because (i) the Will expressly provides trustees will be reimbursed for reasonable costs and expenses; (ii) the Maine Rules of Professional

Conduct recognize a third party can pay for legal services without becoming a client, M.R. Prof. Conduct 1.8(f); and (iii) other jurisdictions have held that payment of fees does not determine the ownership of the attorney-client privilege. *See Wells Fargo Bank v. Super. Ct.*, 990 P.2d 591, 598 (Cal. 2000).

Plaintiffs counter that BHTS has provided only dicta and general policy concerns regarding the fiduciary exception, not analogous cases, though they do not mount an argument that the fiduciary exception actually does apply here. They distinguish *Gleichman* because in that case, the plaintiffs incorrectly claimed to be minority shareholders and the LLC operating agreement in question explicitly stated the manager had total discretion to withhold information from other LLC members, so the fiduciary exception was inapplicable. *Gleichman*, 2017 Me. Bus. & Consumer LEXIS 15, at *7-9. Additionally, Plaintiffs note that they disagree that this Court lacks the authority to recognize a new exception because they believe the Supreme Judicial Court's power is only stated as relating to adding a new *privilege*, not defining *exceptions* to existing privileges. *See* 4 M.R.S. § 9-A, *Citizens Commc'n Co.*, 2007 ME 114, ¶ 14, 931 A.2d 503.

ii.     Analysis

As an initial matter, this Court likely does not have the power to recognize a new exception to the attorney-client privilege established in Maine law. By statute, only the Supreme Judicial Court has the power to "add to, amend or modify rules of evidence," 4 M.R.S. § 9-A, and that exclusive authority extends to the creation of new exceptions. Second, Justice Murphy in her decision stated simply that she was unaware of any basis in Maine caselaw for adopting the fiduciary exception, so the

9

details of the *Gleichman v. Scarcelli* case are not relevant. And in a U.S. Supreme Court case from 2011, *Riggs* was limited to its facts. *See Jicarilla Apache Nation*, 564 U.S. at 178-79. Thus there appears no basis in the statute or case law for the Court to recognize a fiduciary exception to the attorney-client privilege.[2]

### B. Joint Client Exception

#### i. Arguments

In lieu of the fiduciary exception, Plaintiffs argue that BHTS's objection is misguided in part because BHTS assumes that it and Poor were not joint clients. Plaintiffs rely on BHTS's denial of ¶ 42 of Plaintiffs' Second Amended Complaint, to argue that BHTS considered at least one Plaintiff to have been a client or joint client of Pierce Atwood. Plaintiffs further argue that BHTS's shifting position on whether Pierce Atwood represented joint clients should estop BHTS from now arguing Pierce Atwood's services were provided solely to BHTS.

BHTS asserts that it was Pierce Atwood's only relevant client and that both BHTS and Pierce Atwood understood this to be true, as did Plaintiffs. The Trust itself could not retain counsel because a trust is not a legal entity, it is a fiduciary relationship. *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 383 (2016). As such, only the trustee and beneficiary could retain counsel, and each retained separate counsel. BHTS notes that Plaintiffs do not argue they ever requested legal advice from Pierce Atwood, only that they are clients by implication. BHTS asserts

---

[2] There is a Maine trial court case, *Lessard v. Metropolitan Life Insurance Company*, which cites *Riggs* for guidance but specifically attaches its analysis to attorney-client privilege asserted by ERISA plan fiduciaries. 1986 Me. Super. LEXIS, at *11-12 (June 16, 1986). On its facts, *Lessard*'s interpretation of the fiduciary exception has no application to the current case.

that its denial of ¶ 42 means only that Pierce Atwood's representation of BHTS was not adverse to Plaintiffs.

ii.   Analysis

The beliefs of the parties as to their attorney-client relationships do not necessarily govern the legal reality of their relationships. *Lessard*, 1986 Me. Super. LEXIS 214, at *8-10 (Sept. 30, 1986). Nevertheless, it is instructive that prior to this discovery dispute, it appears none of the parties or attorneys in this case considered either of the Plaintiffs to be the sole or joint client of Pierce Atwood. At the very least, BHTS's position has been consistent throughout, and there is no basis for estopping BHTS from arguing against the joint client exception. In any event, the conduct of the parties here is dispositive. No communications were made between Plaintiffs and Pierce Atwood, Plaintiffs never sought legal services from Pierce Atwood, and Plaintiffs never granted BHTS the authority to seek such advice on their behalf. The point of the attorney-client privilege is "that the interests of justice are best served by encouraging clients to make full disclosure to their attorneys and thus enable their attorneys to serve them more effectively." *Id.* (quoting Field & Murray, *Maine Evidence*, p. 94). Where no such disclosures were made between Plaintiffs and Pierce Atwood, it can hardly be claimed that Plaintiffs were Pierce Atwood's clients. As such, Plaintiffs cannot be considered joint clients and the rationale for the joint client exception has no place here.

*C.  Crime-Fraud Exception*

Under Rule 502, the attorney-client privilege does not apply if the client sought or obtained the lawyer's services in furtherance of what the client knew or reasonably

11

should have known was a crime or fraud. M.R. Evid. 502(d)(1). The party seeking to establish this exception must show that (i) the client was engaged in or planning criminal or fraudulent activity at the time the privileged communication took place, and (ii) the communications were intended by the client to facilitate or conceal that crime or fraud. *Harris Mgmt. Co.*, 2016 ME 166, ¶ 24, 151 A.3d 7. The requisite showing of fraud for the purposes of this exception "falls short of fully realized civil tort fraud" and need only be activity which is deceptive and fraudulent." *Id.* ¶ 30.

Plaintiffs claim BHTS was engaged in deceptive actions and its communications with Pierce Atwood were intended to facilitate and/or conceal these actions. They cite several examples of this alleged activity, but provide no affidavits in support of their allegations, and the exception cannot be established on the basis of unsupported claims alone. Even if the Court were to credit the claims, BHTS responds that (i) it did not withhold any records from Plaintiffs aside from those over which it is claiming privilege; (ii) BHTS did not attempt to coerce Plaintiffs into signing any waivers and did release all Trust funds in the end; and (iii) there is nothing fraudulent about using Trust funds to pay for BHTS's legal counsel because the Will and relevant statutes authorize BHTS to be reimbursed for trust administration costs. Because BHTS has a plausible explanation for its conduct, Plaintiffs' broad statement that "BHTS was engaged in or planning deceptive actions" is insufficient for this Court to apply the crime-fraud exception.

### III. Waiver

Where a privilege exists and no exception applies, the privilege holder can waive the privilege if he or she voluntarily discloses or consents to the disclosure of

any significant part of the privileged matter (unless the disclosure itself is privileged). M.R. Evid. 510. The determination of "significant part" is at the discretion of the judge. *See Jacques v. Pioneer Plastics*, 676 A.2d 504, 509 (1996) (citing Field, McKusick & Wroth, *Maine Civil Practice* § 26.18b at 212 (2d ed. Supp. 1981)). In some situations, the privilege holder's conduct "should in fairness amount to a waiver. Field & Murray, *Maine Evidence* § 510.1 at 253 (6th ed. 2008); *see Jensen v. S.D. Warren Co.*, 2009 ME 35, ¶ 34, 968 A.2d 528 (holding assertion of attorney-client privilege by plaintiff improper when used to avoid disclosing timeline of understanding cause of injury and thereby circumvent statute of limitations).

In this case, part of the Plaintiffs' Complaint is that BHTS improperly used Trust funds to pay for its own legal defense against Plaintiffs while serving as their fiduciary. By asserting that all legal services related to BHTS's fiduciary duties as administrative trustee are subject to privilege, the Plaintiffs say they are unable to obtain the documents which would actually prove that BHTS improperly used Trust funds in this manner. They also say that BHTS's Answer, interrogatory responses, 26(g) letter, and informal correspondence put the documentation relating to legal services into issue in connection with essential facts, and that because BHTS has already stated the "nature" of the documents, the privilege is not being invoked to keep the information confidential but simply to prevent inquiry into their contents.

BHTS responds that it has consistently and actively asserted the attorney-client privilege since before the litigation was even filed and points to the Second Amended Complaint as including allegations by Plaintiffs that BHTS was refusing to provide documents it alleged were privileged. *See* Pls.' Second Am. Compl. ¶¶ 45-46

13

(alleging Plaintiffs were "forced to serve BHTS with a subpoena to produce documentation related to these fees. . . because BHTS would not disclose such information voluntarily"). It also distinguishes *Jensen* because in that case the plaintiff was trying to have it both ways: he disclosed the most significant part of the communication to show the lawsuit was timely but otherwise sought to protect related communications from disclosure. *Jensen*, 2009 ME 35, ¶¶ 29, 34, 968 A.2d 528. As for its Answer and other documents, BHTS merely responded to Plaintiffs' filings, which does not mean it put its legal services from Pierce Atwood into issue, and has not revealed the substance of any communication over which it asserts privilege. Accordingly, BHTS has not waived its attorney-client privilege with Pierce Atwood.

CONCLUSION

For all these reasons, the Court sustains BHTS's objection to the aforementioned discovery requests on the grounds of attorney-client privilege.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

05/12/2022

_____
Michael A. Duddy
Judge, Business and Consumer Docket

Entered on the docket:  05/12/2022

14

STATE OF MAINE                         BUSINESS & CONSUMER DOCKET
CUMBERLAND, ss.                        LOCATION: PORTLAND
                                       DOCKET NO. BCD-CV-18-27


FREDERICK J. POOR,          )
et al.,                     )
                            )
              Plaintiffs    )
                            )
v.                          )          ORDER DENYING DEFENDANT LINDELL'S
                            )          MOTION TO DISQUALIFY
ROBERT K. LINDELL, JR.,     )
et al.,                     )
              Defendants    )


        The background and context of this matter are largely set forth in the Court's

many prior orders in this case, and will not be recapitulated here except to the extent

necessary to decide Defendant Robert K. Lindell, Jr.'s Motion to Disqualify

Christopher MacLean, Esq., Sarah Gilbert, Esq., and the firm of Camden Law LLP from

serving as Plaintiffs' counsel. For the reasons discussed below, the Court finds that

Lindell has demonstrated the existence of an imputed conflict of interest. However,

because Lindell has not shown he is actually prejudiced by the imputed conflict, the

Court DENIES the Motion to Disqualify,

                            PROCEDURAL BACKGROUND

        On August 29, 2019, Defendant Robert K. Lindell, Jr. ("Lindell") moved to

disqualify attorneys MacLean, Gilbert, and the firm of Camden Law (collectively

"Plaintiffs' Counsel"). Lindell argued that Plaintiffs' Counsel should be disqualified

because Gilbert and Camden Law had previously represented Janet Ekrote (Frederick

1

Poor's sister); and Lindell had previously appointed MacLean as Lindell's agent to act on his behalf as Trustee. Lindell argued these relationships created a conflict of interest. On September 13, 2019, Lindell supplemented his Motion, arguing that MacLean made misrepresentations during a telephonic discovery conference with the Court.[1] On September 18, 2019, Plaintiffs' Counsel filed a superficial, two page, Opposition. The Opposition was so brief, it failed to provide the Court with sufficient information with which to decide the Motion on the papers. Accordingly, the Court set the Motion for oral argument.

Prior to oral argument, on October 18, 2019, counsel for Defendant Bar Harbor Trust Services ("BHTS") filed a letter with the Court, drawing the Court's attention to a potential basis for disqualification that was not raised by Lindell. According to BHTS, attorney Lee Woodward, Esq., had joined Camden Law in early 2019, and because Woodward may have previously represented Lindell, Camden Law might have an imputed conflict of interest.

On October 29, 2019, the Court held oral argument in Rockland, Maine. Attorney MacLean addressed Lindell's arguments. As to the potential conflict involving Woodward, attorney MacLean indicated he did not anticipate the need to address the issue, since it was not raised in a formal motion. After discussion with the parties, the Court agreed to treat the BHTS letter as a supplement to Lindell's Motion. The Court then issued a briefing schedule, giving Plaintiffs an opportunity to file an Opposition addressing the issue, and giving all other parties an opportunity to

---

[1] The Court finds there is no merit to this allegation, and does not address it any further.

2

submit a Reply.  The Court reserved on the question of holding an evidentiary hearing until all the briefs were filed.

On December 2, 2019, the Court held a second oral argument, this time focused on the issues created by attorney Woodward joining Camden Law.  After listening to the arguments, the Court asked whether Lindell or Plaintiffs wanted an evidentiary hearing.  Both Lindell and Plaintiffs stated they did not want an evidentiary hearing.[2] At oral argument, both Lindell and counsel for Plaintiffs made unsworn factual statements.  The statements were not contradictory, but rather supported different aspects of their arguments.  Counsel for Plaintiffs suggested that for purposes of deciding the Motion, the Court credit the assertions of both sides as truthful statements.  Lindell did not object to counsel's suggestion.

FACTUAL BACKGROUND

The following facts are taken from the briefs, affidavits, and supporting documents submitted by the parties, along with representations made during the two oral arguments.  For purposes of deciding this Motion, the Court accepts the representations made during oral argument as truthful proffers of what the evidence would establish at an evidentiary hearing.  Based on this record, the facts are undisputed.

Janet Ekrote

---

[2] It is possible that conducting an evidentiary hearing would lead to difficult questions of attorney-client privilege and waiver, and neither Lindell nor Plaintiffs appeared interested in navigating those waters.  No other party wanted an evidentiary hearing, either.  Counsel for Defendant Barbara Gray suggested an evidentiary hearing might be helpful to the Court, but confirmed that Gray was not asking for an evidentiary hearing.

Prior to the start of the current litigation, Camden Law previously represented Janet Ekrote. Ms. Ekrote is one of the three children of the late Phyllis Poor (the other children being Frederick and Daniel Poor); she is, therefore, Frederick Poor's sister. Ms. Ekrote was not a beneficiary of the Estate or of the testamentary trusts. She initiated litigation not to challenge being left out of the will or the trusts, but to remove Lindell and Gray as co-personal representatives, and to remove Daniel Poor as Frederick's guardian. Her goal was to protect Frederick Poor's interests. Camden Law's prior representation of Ms. Ekrote was thus consistent with Camden Law's representation of Plaintiffs (Frederick Poor and the Frederick Poor Trust) in the current lawsuit, and adverse to Lindell. Camden Law did not represent Lindell in the prior litigation, and did not obtain any client confidences from Lindell.

Power of Attorney

In May 2018, shortly after this litigation was commenced, Lindell signed a Power of Attorney ("POA") appointing MacLean as his agent. Lindell was indicted at the time, and being held on a no-bail hold. Lindell was represented by criminal defense counsel, who had numerous conversations with MacLean about the POA. The effect of the POA was to authorize MacLean to act on Lindell's behalf as Trustee of the trusts. It is unclear with whom the idea originated, but one purpose of the POA (from Lindell's perspective), was to cast Lindell in a better light for an upcoming bail hearing.

Lindell signed the POA at the jail. His criminal defense attorney was present, and approved of the strategy. MacLean was also present, and after Lindell signed the POA, Lindell discussed with MacLean several aspects of Lindell's activities as Trustee.

4

Lindell's criminal defense attorney was present for that conversation. Thereafter, Lindell had several additional conversations with MacLean about the trusts. Lindell's criminal defense attorney was not present for those additional conversations, but was aware they were occurring, and authorized the conversations.

Ultimately, as the result of information Lindell provided to MacLean pursuant to the POA relationship, MacLean learned about the location and disposition of trust assets. Acting under the authority of the POA, MacLean took steps to seize and preserve trust assets, in particular real estate and items of tangible personal property located in Cloverdale, California. Some of the steps MacLean took were adverse to Lindell. MacLean also learned about certain actions taken by Lindell as Trustee, which actions now constitute some of the basis for Plaintiffs' claims against Lindell. In total, MacLean served as Lindell's POA from May 14, 2018 until October 2018, when Lindell resigned as the Trustee of the trusts.

Lee Woodward, Esq.

On July 10, 2012, Lindell filed an Application for Informal Probate of Will and Appointment of Personal Representative in the Waldo County Probate Court, in connection with the Estate of Phyllis J. Poor. The Application displays Lindell as the "Applicant," and displays attorney Woodward as the "Attorney for Applicant." The Application requests that Lindell (and Barbara Gray) be appointed as personal representatives. The Devisees listed on the Application include, among others, "R. Kenneth Lindell, Trustee."

As counsel to Lindell, Woodward conducted privileged and confidential communications with Lindell regarding Lindell's conduct as co-Personal

5

Representative of the Estate, Trustee of the trusts, and regarding allegations of misconduct concerning both of those roles.[3] Lindell communicated frequently with Woodward during the first six months of Woodward's engagement. Thereafter, Lindell formally communicated with Woodward on approximately one half dozen occasions through March 2014. On March 14, 2014, Lindell sent an email to Defendant Gray in which he refers to "consulting with my own attorney" to fight a subpoena. The attorney to whom Lindell referred is Woodward. After that, Lindell only spoke informally on occasion with Woodward at community events, such as Rotary meetings. Some of those informal conversations, however, involved a brief discussion of legal matters relating to the Estate and the Trusts. At some point between 2014 and 2018, Woodward ceased functioning as Lindell's legal counsel. In November 2018, Lindell sent Woodward a letter from Two Bridges Regional Jail, discussing two matters in the current litigation. Woodward did not respond. Based on his representation of Lindell, Woodward is in possession of privileged and confidential emails, letters, communications, and other material relevant to Plaintiffs' claims against Lindell.

At the beginning of 2019, attorney Woodward, who previously practiced as a solo practitioner in The Law Office of Lee Woodward, joined Camden Law, where he now practices as an associate attorney.[4] Woodward still practices in his office in Belfast, but that office now serves as a satellite office of Camden Law (which is located

[3] Camden Law initially took the position in its Opposition to the supplemental Motion that Woodward represented the Estate of Phyllis Poor, not Lindell. Camden Law ultimately dropped that position in the face of the weight of the evidence. Camden Law now concedes Woodward represented Lindell as Personal Representative, and that Woodward and Lindell had an attorney-client relationship.
[4] Technically, Woodward consolidated his then existing practice into Camden Law.

in Camden), with a separate computer system, and separate staff. He does not practice as a litigator.

Upon joining Camden Law in January 2019, Camden Law added Woodward to its letterhead as an "Affiliate Attorney." Other attorneys on the letterhead are designated as "Partners," "Associate Attorney," "Of Counsel," or "Retired." Camden Law sent Lindell correspondence in this case using the updated letterhead showing Woodward as an "Affiliate Attorney." However, neither Woodward nor Camden Law sent Lindell written notice pursuant to M.R. Prof. C. 1.10(a)(2)(ii) (the imputation rule). Camden Law did not describe the screening procedures employed; did not provide a statement of compliance; did not inform Lindell that review was available before a tribunal; and did not agree to respond promptly to any written inquiries or objections. Indeed, Camden Law took no active steps to screen Woodward from this litigation until sometime in November 2019, after briefing on the Motion to Disqualify got underway. At that point, the screening consisted of instructing staff that Woodward could have no access to or involvement in the litigation.

As it turns out, however, Woodward has not had any role in the litigation. He has not entered an appearance in the case. Moreover, Lindell has not offered any proof (or made a proffer) that Woodward has shared with Plaintiffs' counsel (MacLean and Gilbert) any privileged or confidential information regarding Lindell. Lindell has not even alleged that such a disclosure has occurred. Plaintiffs' counsel deny that they have obtained any information of any kind from Woodward regarding Lindell. The Court treats the denial as a proffer that no such disclosure has occurred. It is not contested by Lindell.

7

On October 15, 2019, counsel for BHTS served on Woodward a deposition and inspection subpoena, seeking Woodward's testimony and documents relating to the actions of Lindell in connection with the Estate and the trusts. In response, counsel for attorney Woodward objected,[5] on the following grounds:

> Any information Mr. Woodward has in relation to the subpoena would have been obtained as a result of him acting in his capacity as the attorney for the personal representative. He cannot release any of that information without the consent of the client or order of the court.
>
> I am mindful of the requirement of rule 45(d)(2) to give a description of the documents which are privileged. Because I believe everything in the file (or even a description of what is contained in the file) is confidential, I am not going to give a more detailed explanation. I believe what I have said is sufficient to put you on notice of why I am objecting and to enable you to contest my objection.
>
> For now, I am going to assume he should not appear at the deposition. If you are expecting him to attend, please let me know.

Lindell has not consented to Woodward releasing any information. Because of the objection lodged by Woodward's counsel, Woodward's deposition has not been taken.

## DISCUSSION

Motions for disqualification are capable of being abused for tactical purposes.[6] *Morin v. Me. Educ. Ass'n*, 2010 ME 36, ¶ 8, 993 A.2d 1097. To guard against such abuse,

[5] Woodward is using counsel other than from Camden Law to represent him with regard to the subpoena.
[6] Camden Law argues that Lindell's Motion to Disqualify is being abused for tactical purposes. Lindell concedes that after he brought his Motion, he made statements to counsel for his ex-wife, Defendant Althea Latady, that Lindell would consider withdrawing the Motion if by doing so it would get Latady out of the litigation. Latady's counsel, not Lindell, then improperly used the Motion as a bargaining chip to attempt to get Latady dismissed. At oral argument, the Court strongly disapproved of the actions of all concerned. Nevertheless, Lindell's post hoc conduct does not undermine the good faith

8

a motion to disqualify may only be granted where the moving party shows that (1) "continued representation of the nonmoving party by that party's chosen attorney results in an affirmative violation of an ethical rule" <u>and</u> (2) "continued representation by the attorney would result in actual prejudice to the party seeking that attorney's disqualification." *Morin*, 2010 ME 36, ¶¶ 9-10. Courts will not assume the existence of prejudice to the moving party just by the mere fact that an ethical violation was committed, even when that ethical violation involves confidential information. 2010 ME 36, ¶ 10. A mere general allegation that the attorney has some confidential and relevant information she gathered in the previous relationship will not support disqualification. *Id.* Rather, the moving party must articulate "the specific, identifiable harm [they] will suffer in the litigation by opposing counsel's continued representation." *Id.* In sum, the moving party must produce evidence "of both an ethical violation and actual prejudice." *Id.* ¶ 11.

<u>Ethical Violation</u>

The Court starts by noting briefly that it finds no ethical violation in Camden Law's prior representation of Janet Ekrote, or in attorney MacLean's service as Lindell's POA. As to the latter situation, serving as POA for an individual, while at the same time representing clients who are suing that individual, is certainly unusual and fraught with risk. However, Lindell was separately represented by criminal defense counsel at the time, and defense counsel advised Lindell on the desirability of appointing MacLean as POA. Lindell's appointment of MacLean as POA was thus

with which he originally brought the Motion, nor does it detract from the very real merits of the Motion, which the Court explores at length in this Order.

9

knowing and voluntary, and had the effect of constituting written informed consent to the extent it was necessary. *See* M.R. Prof. Conduct 1.6-1.8. Moreover, if Lindell was unhappy with MacLean's actions as POA, Lindell could have revoked the POA at any time.

The real ethical question in this case is whether by joining Camden Law, Woodward created a conflict of interest that must be imputed to the attorneys at Camden Law (MacLean and Gilbert) who are conducting the litigation in this case. *See* M.R. Prof. Conduct 1.10 (Imputation of Conflicts-of-Interest: General Rule). The Court starts first by examining M.R. Prof. Conduct 1.9 (Duties to Former Clients), which Camden Law acknowledges is the starting point for the analysis. The analysis is conducted with regard to Woodward, and then the question of imputation is examined under M.R. Prof. Conduct 1.10.

Rule 1.9 has three prongs, each of which be addressed in turn. Under the first prong, "a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." M.R. Prof. Conduct 1.9(a). In this case, Lindell did not give Woodward any such informed consent, and Plaintiffs' interests in the current matter are materially adverse to Lindell's interests in the former matter.

Matters are "substantially related" for purposes of this Rule "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior

10

representation would materially advance the client's position in the subsequent matter." M.R. Prof. Conduct 1.9(d). In this case, Woodward not only advised Lindell with regard to probating the Will of Phyllis Poor, but over the course of at least two years Woodward advised Lindell regarding Lindell's conduct as co-Personal Representative of the Estate and Trustee of the trusts, and regarding allegations of misconduct concerning both of those roles.[7] The Second Amended Complaint in this case contains numerous allegations that Lindell engaged in wrongdoing as co-Personal Representative and Trustee of the trusts. *See* Second Amended Complaint ¶¶ 9, 11, 12, 13, 15, 16, 17, 24, 25-28, 62, 69, 78, 86, 89, 94, 98, 115. Indeed, Plaintiffs' case against Lindell is constructed around those allegations. Thus, Woodward's prior representation of Lindell and the current litigation involve the same transaction or legal dispute. Moreover, there is no question that Woodward obtained confidential factual information in his prior representation of Lindell that would materially advance Plaintiffs' position in this litigation. Accordingly, under the first prong of Rule 1.9, the matters are substantially related and Woodward is prohibited from representing Plaintiffs in the litigation.

Under the second prong, a lawyer is proscribed from knowingly representing "a person in the same or substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client" whose interests are materially adverse to that person, and about whom the lawyer had acquired confidences and secrets protected by Rules 1.6 and 1.9(c). M.R. Prof. Conduct 1.9(b).

[7] Indeed, the Application for Informal Probate of Will and Appointment of Personal Representative lists Lindell as a devisee in his capacity as Trustee, underscoring the extent to which issues involving the Estate and the trusts are interrelated, and have been from the start.

11

In this case, the Court can reasonably infer that Woodward is aware Camden Law is representing Plaintiffs in the litigation. As discussed above, Lindell has not provided informed consent; the litigation is materially adverse to Lindell; and the litigation is substantially related to Woodward's prior presentation of Lindell. Further, Woodward acquired privileged and confidential information from Lindell regarding his conduct as co-Personal Representative of the Estate and Trustee of the trusts, and allegations of misconduct concerning both of those roles. The information obtained by Woodward is protected by Rules 1.6 and 1.9, because the information includes confidences and secrets of a former client. Accordingly, under the second prong of Rule 1.9 Woodward is prohibited from representing Plaintiffs in the litigation.

Under the third prong, "[a] lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter" use or reveal confidences or secrets of the former client to his or her disadvantage, unless the information has become generally known. M.R. Prof. Conduct 1.9(c). In this case, Lindell has offered no proof or proffer that Woodward has used or revealed any of Lindell's confidences or secrets. Accordingly, the third prong of Rule 1.9 is not implicated.

However, since the first two prongs of Rule 1.9 prohibit Woodward from representing Lindell in this litigation, the Court needs to evaluate whether Woodward's conflict of interest must be imputed to the other attorneys of Camden Law. M.R. Prof. Conduct 1.10 provides that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9," subject to certain

12

exceptions.  The only exception that potentially applies to this case has to do with screening and notice.  *See* M.R. Prof. Conduct 1.10(a)-(e).  A prohibition based on Rule 1.9(a) or (b) is not imputed to other attorneys in the firm if (i) "the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom;" and (ii) "written notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures."  M.R. Prof. Conduct 1.10(a)(2)(i) & (ii).[8]

In this case, Woodward and Camden Law did not comply with the screening and notice requirements.  First, Camden Law did not timely screen Woodward.  Woodward joined Camden Law in January 2019.  Camden Law did not screen Woodward until November 2019,[9] and then only after briefing on the Motion to Disqualify had gotten underway.[10]  Second, neither Woodward nor Camden Law sent Lindell the required written notice.  Woodward and Camden Law failed to provide

[8] There is also a requirement to send certifications of compliance with these Rules at reasonable intervals upon the former client's written request.  M.R. Prof. Conduct 1.10(a)(2)(iii).  Since Woodward and Camden Law failed to give Lindell notice of his right to request certifications of compliance, Lindell never asked for them.

[9] The screening that took place in November 2019—informing staff that Woodward could have no role in or access to the litigation—was too little, as well as being too late.  Camden Law has still not formulated a comprehensive set of screening protocols sufficient to satisfy the requirements of M.R. Prof. Conduct 1.10(a)(2).

[10] As discussed in footnote 3, *supra*, in response to the supplemental Motion Camden Law originally took the position that Woodward represented the Estate, not Lindell.  This may explain, but not excuse, Camden Law's failure to timely implement screening procedures and send Lindell the required written notice.  The fact that Lindell was Woodward's client was verifiable from the outset from the public record.

Lindell with a description of the screening procedures employed, a statement of compliance, a statement about tribunal review, or an agreement to respond promptly.11  Since Camden Law failed to comply with the applicable exception to imputation, Woodward's conflict of interest under the Rules must be imputed to all the attorneys of Camden Law, including those attorneys conducting this litigation for Plaintiffs.

Camden Law tries to escape this conclusion on several grounds, none of which are persuasive.  First, Camden Law suggests that it did timely screen Woodward, because from the outset Woodward was located in a separate office, with a separate computer system, and separate staff.  However, these features of Woodward's office set-up were not imposed as a result of any intentional effort to compartmentalize Woodward from this litigation.  Rather, Woodward's office set-up was simply due to the fact that upon joining Camden Law, Woodward remained in his old office with his then-existing computer system and staff.  As attorney Gilbert eventually conceded at the second oral argument, Camden Law did not actively impose any screening procedures until November 2019.12

Camden Law also argues that it satisfied the written notice requirement, because Camden Law began sending Lindell correspondence with Woodward's name displayed in the letterhead.  This argument lacks any merit.  First, simply including Woodward's name on the letterhead falls far short of conveying the detailed

11 Camden Law has still not provided Lindell with the required written notice.  Although Camden Law cannot at this point cure the untimeliness of its actions, it can and must otherwise attempt to come into compliance with M.R. Prof. Conduct 1.10(a)(2) moving forward.
12 And the screening procedures were *de minimis*.  See footnote 9, *supra*.

information required by M.R. Prof. Conduct 1.10(a)(2)(ii). Second, Camden Law's classification of Woodward on its letterhead as an "Affiliate Attorney" is ambiguous at best, and cannot reasonably be construed as sufficient to have put Lindell on notice that he needed to bring his Motion to Disqualify sooner.

Based on the above, Lindell has satisfied his burden of demonstrating that the attorneys of Camden Law have committed an ethics violation by imputation, and that Camden Law's continued representation of Plaintiffs in this matter results in an affirmative violation of Rules 1.9 and 1.10. The Court next examines whether Lindell has met his burden of showing that continued representation of Plaintiffs by Camden Law would result in actual prejudice to Lindell.

Actual Prejudice

Lindell argues that he is prejudiced in the litigation because Woodward "is in possession of confidential emails, letters and other communications that are directly relevant to the Plaintiffs' case against me." He does not, however, point to the specific, identifiable harm he will suffer in the litigation by Camden Law's continued representation of Plaintiffs. Moreover, Lindell does not allege that Woodward has disclosed or otherwise provided any confidential information to the other attorneys at Camden Law, especially the attorneys conducting the litigation. He certainly offers no proof or proffer of any such disclosure, and he has declined the opportunity for an evidentiary hearing. Accordingly, Lindell has failed to meet his burden of demonstrating actual prejudice.

Lindell resists this conclusion by arguing that under the applicable case law he has satisfied his burden of showing actual prejudice, by proving the ongoing ethical

15

violation by the attorneys at Camden Law. Lindell in particular relies on *Estate of Markheim v. Markheim*, 2008 ME 138, 957 A.2d 56, and *Hurley v. Hurley*, 2007 ME 65, 923 A.2d 908, neither of which, at least ostensibly, required a showing of actual prejudice. Lindell contends these two cases are more applicable on the facts than *Morin v. Me. Educ. Ass'n*, 2010 ME 36, 993 A.2d 1097, and thus support disqualification of Camden Law. As discussed below, however, both *Estate of Markheim* and *Hurley* are distinguishable in a key respect, and as the more recently decided case, *Morin* establishes the governing law in this area.

In *Estate of Markheim v. Markheim*, the Markheims "provided specific examples of what [the attorney] learned as a result of the prior representation." *Estate of Markheim*, 2008 ME 138, ¶ 20. Moreover, the attorney who was the subject of the Motion to Disqualify was the actual attorney conducting the litigation against the Markheims. *Id.* at ¶ 9. That is a significant difference from the facts of this litigation, where Woodward is not the actual attorney conducting the litigation against Lindell, and there is no evidence that Woodward has shared any confidential information with the Camden Law attorneys who are conducting the litigation. In *Estate of Markheim* there was no need for the Court to discuss actual prejudice. Because the attorney who had obtained the confidential information from his prior representation of the Markheims was the attorney who was then using the information to bring an action against the Markheims, actual prejudice was inherent in the proof of the ethical violation.

So to with *Hurley v. Hurley*. In a prior representation, the attorney who was the subject of the Motion to Disqualify had obtained details concerning the moving

16

party's "health, work history, injury history, and a workers' compensation claim." *Hurley v. Hurley*, 2007 ME 65, ¶ 2. In a subsequent divorce action, that same attorney was using the information to represent the moving party's husband against the moving party. *Id.* at ¶¶ 4, 13-15. Because the attorney who had obtained the confidential information from his prior representation of the moving party was the attorney who was then using the information to bring an action against the moving party, actual prejudice was inherent in the proof of the ethical violation.

*Morin* was decided after *Estate of Markheim* and *Hurley*, and expressly stated the need to show both an ethical violation and actual prejudice. *Morin* did not overrule or otherwise call into question *Estate of Markheim* and *Hurley*, because there was no need to do so. *Morin* is not inconsistent with *Estate of Markheim* and *Hurley*, where, on the facts of those cases, actual prejudice was inherent in the proof of the ethical violation. In any event, *Morin* is now the governing law which this Court is required to apply, and *Morin* requires proof of actual prejudice. Since Lindell has failed to demonstrate actual prejudice, his Motion to Disqualify Camden Law is DENIED.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

December 9, 2019.

_____/s_____
Michael A. Duddy
Judge, Business and Consumer Docket

17

STATE OF MAINE                          BUSINESS & CONSUMER DOCKET
CUMBERLAND, ss.                         LOCATION: PORTLAND
                                        DOCKET NO. BCD-CV-18-27


FREDERICK J. POOR,          )
et al.,                     )
                            )
            Plaintiffs      )
                            )
v.                          )           ORDER DENYING LINDELL'S MOTION
                            )           TO RECONSIDER
ROBERT K. LINDELL, JR.,     )
et al.,                     )
            Defendants      )


By letter dated September 10, 2019, Defendant Robert K. Lindell, Jr. ("Lindell")

asks this Court to reconsider its prior Order denying Lindell's Motion to Amend his

Answer. Lindell specifically asks the Court to reconsider its decision in light of

arguments Lindell made in his reply letter of September 9, 2019.

The Court has carefully considered Lindell's September 9, 2019, arguments.

The Court finds no grounds to change its prior Order. The cases cited by Lindell,

*Morrison v. Sayer*, 2011 ME 136, 33 A.3d 432, and *Martin v. Dept. of Corrections*, 2018

ME 103, 109 A.3d 237, are inapposite. Neither Lindell's right to appear at a hearing,

not the prisoner mailbox rule, are implicated by Lindell's failure to answer the

amended complaints or his significantly untimely Motion to Amend. Lindell's due

process rights have not been undermined. Indeed, as noted by the Court in its prior

order, Lindell has been an active and knowledgeable participant in the litigation, in

person and via phone conferences. The Court previously reviewed the exhibits

attached to Lindell's Motion to Amend, including Exhibits H and I, and nothing about

1

those exhibits justifies granting Lindell's Motion to Amend. Accordingly, Lindell's Motion to Reconsider is denied.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

September 18, 2019.

_____/s/_____
Michael A. Duddy
Judge, Business and Consumer Docket

*Frederick J. Poor, individually and as Sole Beneficiary
to the Frederic J. Poor Supplemental Needs Trust and
Frederic J. Poor Trust Dated August 20, 2004 a/k/a Phillis
Poor Trust for Frederic Poor and as Beneficiary to the
Estate of Phyllis Poor*

**v.**

*Robert Kenneth Lindell, Jr, individually and in
his capacity as Trustee to the Frederic J. Poor Trust
Dated August 20, 2004 and Barbara Gray*

| | |
|---|---|
| *Frederick J. Poor*<br>*Frederic J. Poor Supplemental*<br>*Needs Trust* | Christopher MacLean, Esq.<br>Sarah Gilbert, Esq.<br>*20 Mechanic Street*<br>*Camden, ME 04843* |
| *Robert Kenneth Lindell, Jr.* | Pro-se |
| *Barbara Gray* | Patrick Mellor, Esq.<br>Andrew Sarapas, Esq.<br>*PO Box 248*<br>*Rockland, ME 04841* |
| *Althena Latady* | John Simpson, Esq.<br>*5 Island View Drive*<br>*Cumberland Foreside, ME 04110* |
| *Bar Harbor Trust Services* | Eric Wycoff, Esq.<br>Kyle Noonan, Esq.<br>Marianna Liddell, Esq. |

STATE OF MAINE                                    BUSINESS & CONSUMER DOCKET
CUMBERLAND, ss.                                   DOCKET NO. BCD-CV-18-27


FREDERIC J. POOR, et al.,                    )
                                             )
            Plaintiffs,                      )
                                             )
      v.                                     )      ORDER ON DEFENDANT BAR
                                             )      HARBOR TRUST SERVICES' MOTION
BAR HARBOR TRUST SERVICES, et                )      TO DISMISS
al.,                                         )
                                             )
            Defendants,                      )


When Phyllis Poor ("Poor") passed away, she left an estate valued at over six million

dollars, much of which was to be held in trust for the benefit of her son, Frederic J. Poor, as well

as her grandchildren, in two testamentary trusts. Plaintiffs allege Poor's intention was undermined

by Defendants in this matter, principally Defendant Robert Kenneth Lindell, Jr. ("Lindell"), who

significantly misappropriated trust funds.  Plaintiffs also allege that Defendant Bar Harbor Trust

Services ("BHTS"), as administrative trustee of the two trusts, allowed Lindell to loot the assets

of the two trusts.

BHTS moves to dismiss the Complaint in its entirety for failure to state a claim, or,

alternatively, for a stay of this action to allow the Hancock County Probate Court (the "Probate

Court") to rule on a declaratory judgment action BHTS filed there before it was named in this

lawsuit.[1] M.R. Civ. P. 12(b)(6). Plaintiffs—Frederick Poor and Maryellen Sullivan, Esq., in her

capacity as trustee of each trust—oppose the motion. The Court heard oral argument on the motion

on August 7, 2019. Eric Wycoff, Esq. represented BHTS and Sarah Irving Gilbert, Esq.

---

[1] The Court denies BHTS's motion to stay and declines to consider its argument for dismissal on procedural grounds. This action was commenced first and BHTS either knew, or should have known, that it would be brought into this litigation.

1

represented Plaintiffs. For the reasons discussed below, the Court grants BHTS's Motion in part, and denies the Motion in part.

## BACKGROUND

The operative pleading in this matter is Plaintiffs' Second Amended Complaint (the "Complaint"), filed March 1, 2019 and naming multiple defendants: BHTS and Lindell as well as Lindell's former spouse, Althea Latady, and Barbara Gray, previously co-personal representative of Poor's estate along with Lindell. The Complaint purports to state numerous claims against BHTS: conversion (Count I, also pled against other defendants); breach of fiduciary duty (Count II, also pled against other defendants), fraud (Count III, also pled against other defendants), unjust enrichment (Count V, also pled against other defendants), punitive damages (Count VI, also pled against other defendants), negligence (Count VII, also pled against another defendant); tortious interference (Count VIII, also pled against other defendants), fraudulent conveyance (Count IX, also pled against other defendants), civil conspiracy (Count X, also pled against other defendants), and intentional infliction of emotional distress (Count XI, also pled against other defendants).

According to the Complaint, Poor died testate on June 30, 2019.[2] She left a detailed Last Will and Testament (the "Will"). (Pl.'s Compl. ¶ 6 & Ex. B.) The Will appoints Barbara Gray and R. Kenneth Lindell as co-Personal Representatives of the Estate. (Pl.'s Ex. B, at 1.) The

---

[2] Poor's date of death is shown on Exhibit C to the Complaint, and was agreed upon at oral argument. As a document attached to the Complaint, Exhibit C is a part of the Complaint "for all purposes" and thus can be considered on a motion to dismiss without converting the motion into one for summary judgment. M.R. Civ. P. 10(c). Otherwise, "only the facts alleged in the complaint may be considered on a motion to dismiss," although a "narrow exception allows a court to consider official public documents, documents that are central to the plaintiff's claim, and documents referred to in the complaint, without converting a motion to dismiss into a motion for a summary judgment when the authenticity of such documents is not challenged." *Moody v. State Liquor & Lottery Comm'n,* 2004 ME 20, ¶¶ 8, 10, 843 A.2d 43. Both parties attached multiple exhibits to their memoranda in support of and opposition to the instant motion, some of which were not attached to or referred to in the Complaint, and fail to explain how those exhibits fit into the so-called "*Moody* exception." The Court declines to treat BHTS's motion as one for summary judgment, and disregards all attached exhibits to each party's memorandum, unless the exhibits were attached to the Complaint.

Personal Representatives are given "full power and authority" to dispose of estate assets to effectuate the terms of the Will, as well as all powers, rights, and responsibilities of Personal Representatives under Maine law. (Pl.'s Ex. B, at 1.)

Among other things, the Will creates two trusts: a special needs trust for Poor's son, Frederic J. Poor (the "Special Needs Trust"), and a trust for the benefit of her grandchildren (the "Grandchildren's Trust") (collectively, "Trust" or the "Trusts") (Pl.'s Compl. ¶ 11 & Pl.'s Ex. B, at 2-9.)) Each Trust was to be funded equally with one-third of Poor's residuary estate; two-thirds of her residuary estate were thus to be held in trust for the beneficiaries of the trusts. (Pl.'s Compl. ¶ 12 & Pl.'s Ex. B. at 2, 6-7.))

The Will appoints two types of trustees for each trust: a Personal Trustee and an Administrative Trustee. For each of the Trusts, the Personal Trustee has "sole authority and responsibility" for all matters regarding distributions to the beneficiaries, and decisions regarding the acquisition and disposition of assets for use by the beneficiaries. (Pl.'s Ex. B, at 6, 8.) The Administrative Trustee has "sole authority and responsibility" for all other matters regarding the Trusts, including but not limited to tax matters, investments, and bookkeeping. (Pl.'s Ex. B, at 6,8.) As to each Trust, the Personal Trustee's decision to acquire an asset for use by a beneficiary, or make a distribution, takes priority over the Administrative Trustee's authority to invest trust assets. The Personal Trustee is also given the power for each Trust to remove and replace the person serving as the Administrative Trustee. (Pl.'s Ex. B, at 6,8.)

The Will appoints R. Kenneth Lindell as the Personal Trustee for each Trust, and Bangor Savings Bank as the Administrative Trustee for each Trust. (Pl.'s Ex. B, at 6,8.) Section XI(C) of the Will is entitled "No Duty to Inquire," and provides in relevant part as follows: "No person who deals with any Fiduciary named in or pursuant to this Will shall have a duty to . . . ascertain

3

whether assets paid or transferred to the Fiduciary are properly applied." (Pl.'s Ex. B, at 11,12.) Section XI(D) of the Will is entitled "Exculpation of Fiduciaries," and purports to disclaim Fiduciary liability unless it is shown the Fiduciary "acted in bad faith or with reckless disregard of the Fiduciary's duties." (Pl.'s Ex. B, at 12.) The final sentence of Section XI(D) additionally provides as follows: "No Fiduciary shall incur any personal liability for any action taken or not taken by any Co-Fiduciary or for any action taken or not taken by any predecessor Fiduciary." (Pl.'s Ex. B, at 12.)

On April 5, 2013, nine months after Poor's death, Lindell exercised his authority as the Personal Trustee to remove Bangor Savings Bank as the Administrative Trustee of each Trust,[3] and appoint BHTS as their successor Administrative Trustee. (Pl.'s Compl. ¶¶ 15-17.) BHTS is a corporation, with a principal place of business in Bar Harbor. (Pl.'s Compl. ¶ 8.) It is a wholly owned subsidiary of Bar Harbor Bank and Trust. (Pl.'s Compl. ¶ 8.) BHTS accepted the appointment. (Pl.'s Compl. ¶ 16.) Five days later, on April 10, 2013, Lindell funded the Trusts. (Pl.'s Compl. ¶ 28.)[4]

The Complaint alleges that BHTS "took no steps to ascertain the actual value of Ms. Poor's estate," (Pl.'s Compl. ¶ 18); "allowed the trusts to be funded unequally by Lindell in 2013," (Pl.'s Compl. ¶ 19); "allowed both trusts to be underfunded in amounts exceeding $1,000,000," and "never sought to locate the missing funds or to notify the beneficiaries," (Pl.'s Compl. ¶ 20). The Complaint alleges that on "April 22, 2013—just 12 days after Lindell funded the trusts with BHTS," the Maine Office of Securities publicly sanctioned Lindell for a second time. The Complaint alleges that "BHTS was, or should have been, on notice that as early as June 27, 2013

---

[3] It was explained at oral argument, without dispute, that Bangor Savings Bank never accepted its appointment.
[4] The date Lindell funded the Trusts is established by reference to another date alleged in Paragraph 28. At oral argument, BHTS agreed this was a proper way to establish the date the Trusts were funded.

4

Lindell was engaging in suspicious and unorthodox behavior with regards to securities used to fund both trusts." (Pl.'s Compl. ¶ 26.) The Complaint alleges that BHTS allowed Lindell to wrongfully "extract hundreds of thousands of dollars" from the Special Needs Trust, (Pl.'s Compl. ¶ 22), and, with regard to both Trusts, alleges BHTS otherwise committed multiple acts of mismanagement, concealment, obstruction, and improper use of funds (Pl.'s Compl. ¶¶ 21 – 48).

On May 4, 2015, two years after BHTS accepted appointment as Administrative Trustee, Maine Revenue Services issued an Estate Tax Closing Document indicating the Maine Gross Estate was valued at $6,668,592, and the Maine Taxable Estate was valued at $4,985,865. (Pl.'s Compl. ¶ 9, & Pl.'s Ex. C.)

STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6), courts "consider the facts in the complaint as if they were admitted." *Bonney v. Stephens Mem. Hosp.*, 2011 ME 46, ¶ 16, 17 A.3d 123. The complaint is viewed "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* (quoting *Saunders v. Tisher*, 2006 ME 94, ¶ 8, 902 A.2d 830). "Dismissal is warranted when it appears beyond a doubt that the plaintiff is not entitled to relief under any set of facts that he might prove in support of his claim." *Id.* "The legal sufficiency of a complaint challenged pursuant to M.R. Civ. P. 12(b)(6) is a question of law" and thus subject to de novo appellate review. *Marshall v. Town of Dexter*, 2015 ME 135, ¶ 2, 125 A.3d 1141.

DISCUSSION

**Conversion—Count I**

Count I pleads conversion against all Defendants. With respect to BHTS specifically, Plaintiffs allege that BHTS utilized trust assets to fund its legal defense and, generally, as a member

5

of the class of Defendants acted in concert and conspired with the other Defendants to convert trust assets and as such are jointly and severally liable for other Defendants' conversion. (Pl.'s Compl. ¶¶ 81-83.) BHTS addresses only the first allegation.

To recover for conversion where property is taken wrongfully,[5] a plaintiff must prove that he has a property interest in the converted property and that he had a right to possess the property at the time of conversion. *Estate of Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 14, 157 A.3d 769; *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798. Plaintiffs allege many facts in support of these elements. BHTS argues implicitly that these are not facts but erroneous legal conclusions, because BHTS had a legal right to utilize trust assets to pay its legal fees.

In support of its arguments, BHTS points out that the Will states trustees "shall be reimbursed for the reasonable costs and expenses incurred *in connection with their fiduciary duties under this Will*." (Pl.'s Ex. B, at 10 (emphasis added).) BHTS also analogizes to 18-A M.R.S. § 3-720,[6] which pertains to personal representatives and provides that a personal representative who "defends or prosecutes any proceeding in good faith, whether successful or not, . . . is entitled to receive from the estate necessary expenses and disbursements including reasonable attorney's fees incurred." BHTS's legal arguments, however, do not convert the Plaintiffs factual allegations into legal conclusions. The Complaint is replete with factual allegations that BHTS's expenses were incurred in *breach* of its fiduciary duty and that it has *not* defended this action in good faith. Taken as true, the allegations are sufficient to state a claim for conversion against BHTS, notwithstanding

[5] Plaintiffs do not allege that they made a demand for the return of the property; however, this requirement is waived where the property was taken wrongfully. *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798.
[6] In 2018, Maine's legislature enacted 2018 ch. 402, § A-2, which repealed Title 18-A and replaced it with Title 18-C M.R.S. §§ 1-101—9-404, with the new statutes taking effect July 1, 2019. Section 3-720 was preserved in its entirety with the codification of Title 18-C in 18-C M.R.S. § 3-720.

any defenses BHTS may have under the will or pursuant to Maine statutory law. BHTS's motion must be denied as to Count I.

**Breach of Fiduciary Duty—Count II**

Count II pleads breach of fiduciary duty against all Defendants. For the purposes of analysis with respect to BHTS, it is useful to divide Plaintiffs' breach of fiduciary duty allegations into two categories: (1) the allegations that BHTS allowed the Trusts to be improperly funded (both underfunded and unequally funded); (2) all the other allegations that BHTS committed mismanagement as Administrative Trustee. The first category appears to present a question of first impression in Maine: Does the trustee of a testamentary trust have a fiduciary duty to ensure that the personal representative of an estate properly funds the trust?[7] For the reasons discussed below, the Court answers the question in the affirmative. The second category easily states a claim against BHTS, and at the Motion to dismiss stage does not warrant extended analysis.

Category 1—Improper Funding of the Trusts

In Maine, the law of trusts derives from the Maine Uniform Trust Code, 18-B M.R.S. §§ 101—1104 (2018)(the "Trust Code"), and from the common law and principles of equity, which are used to supplement the Trust Code. 18-B M.R.S. § 106. The Law Court has not yet had occasion to determine whether, based on any of these sources of law, the trustee of a testamentary trust has a fiduciary duty to ensure that the personal representative of an estate properly funds the trust.

Although the question appears novel in Maine, other jurisdictions consider it "settled trust law that 'a trustee owes a duty to the cestui on taking over property from the executor to examine

---

[7]At oral argument, BHTS argued that holding institutional trustees responsible for a failure by the personal representative to transfer assets into a testamentary trust would represent a shift in the way the trust services industry in Maine has heretofore done business.

7

the property tendered and see whether it is that which he ought to receive.'" *In re First Nat'l Bank*, 307 N.E.2d 23, 25 (Oh. 1974)(quoting 6 *Bogert, Trusts and Trustees* § 583 (2d ed. 1960)); *see also In the Matter of Estate of Erlien*, 527 N.W.2d 389, 395 (Wis. App. 1994)("the trustee, once named and upon assumption of office, does have a duty to the beneficiaries of the trust to ensure that the personal representative of the estate transfers to the trustee all property to which" the beneficiaries are entitled); *Bullis v. DuPage Trust Co.*, 391 N.E.2d 227, 231 (Ill. 1979)(trustee of a testamentary trust has the duty "to carefully examine the terms of the trust in order to ascertain exactly what property forms the subject-matter of the trust," *quoting Bogert, Trusts & Trustees* § 583, at 218-219 (2d ed. 1960)); *Pepper v. Zions First Nat'l Bank*, 801 P.2d 144, 151 (Ut. 1990)("[t]he law is settled" that a trustee owes a duty to the beneficiary on taking over property from the executor to ensure the trust receives what is due).

The common law duty of a trustee to ensure testamentary trusts are properly funded is more than one of mere inquiry.

> The trustee should familiarize himself with the duties of the executor toward him and exact accurate performance of these duties. The trustee should also inquire of the executor concerning the history of all the property tendered since it may be important for the trustee to know whether the property delivered was purchased by the testator himself or was an investment made properly or improperly by the executor.

Bogert, *The Law of Trusts and Trustees* § 583. The Restatement of Trusts describes the duty as follows:

> The trustee's duty to administer the trust includes a duty, at the outset of administration, to take reasonable steps to ascertain the assets of the trust estate and to take and keep control of those assets. In the case of a testamentary trust, these initial steps should include obtaining and examining an accounting from (or the records of) the settlor's executor. . . . Furthermore, in cases of these types, the trustee ordinarily has the associated responsibility of taking

8

reasonable steps to uncover and redress any breach of duty committed by a predecessor fiduciary.

Restatement (Third) of Trusts § 76 cmt. d (2007). In other words, pursuant to the common law of trusts as developed in other jurisdictions and in well regarded treatises and secondary sources, the trustee must take reasonable steps, in the nature of due diligence, to ensure the personal representative properly funds the trust.

This common law duty is abrogated or limited by statute in some states. Bogert, § 583, n. 64.50. In New York, for instance, the state's trust code cloaks trustees in nonliability for the acts of a predecessor executor, at least under certain narrowly defined situations. N.Y. Surr. Ct. Proc. Act Law § 1506 (McKinney). The Maine Uniform Trust Code contains no comparable provision. To the contrary, the Trust Code generally appears to codify the common law duty, or at least to impose duties consistent with the common law. 18-B M.R.S. § 106

The Trust Code applies equally to inter vivos trusts as well as testamentary trusts. See 18-B M.R.S. § 401(1). The Trust Code requires a trustee to take reasonable steps "[t]o compel a former trustee or other person to deliver trust property to the trustee." 18-B M.R.S. § 812(1). Lindell was not a former trustee, but as a Personal Representative he was an "other person," and thus proper subject of BHTS's duty under Section 812 to ensure the delivery of trust property. The Trust Code similarly requires a trustee to "take reasonable steps to take control of and protect the trust property." 18-B M.R.S. § 809. Implicit in the duty to "take control of" trust property is the requirement to know the scope and extent of the trust property. The Trust Code imposes on trustees the obligation of prudent administration, which requires the exercise of reasonable care, skill and—notably—caution. 18-B M.R.S. § 804. The Trust Code imposes on trustees with special skills, such as institutional trustees, the duty to use those special skills or expertise to administer the trust. 18-B M.R.S. §§ 801, 806. In this case, BHTS is not a lay person unfamiliar with activities of a

9

trustee, but rather an institutional trustee, a wholly owned subsidiary of Bar Harbor Bank and Trust.  Finally, the Trust Code requires trustees to take reasonable steps to enforce claims of the trust.  18-B M.R.S. § 811.  These provisions taken together, and supplemented by the common law of trusts, impose on the trustee of a testamentary trust in Maine a fiduciary duty to take reasonable steps to ensure that the personal representative of the estate properly funds the trust.

In an effort to avoid imposition of the duty, BHTS first argues that the Probate Code expressly relieves a person that deals with a personal representative from a duty of inquiry.  The Probate Code provides in relevant part as follows:

> A person who in good faith either assists a personal representative or deals with the personal representative for value is protected as if the personal representative's power was properly exercised. The fact that a person knowingly deals with a personal representative does not alone require the person to inquire into the existence of a power or the propriety of its exercise. . . .

18-A M.R.S. § 3-714.[8]  The Law Court has not addressed the scope and applicability of Section 3-714.  Nevertheless, BHTS's reliance on Section 3-714 fails for several reasons.

Based on its plain language, Section 3-714 does not apply to BHTS. BHTS was not assisting the Personal Representative or dealing with the Personal Representative for value.  BHTS was acting as a trustee.  Second, Section 3-714 appears to protect an innocent third party who purchases estate property from the Personal Representative; it does not on its face annul the duties of a trustee of a testamentary trust who must ensure the Personal Representative properly funds the trust. *See Lane v. Bolduc*, No. CV-94-132, 1995 Me. Super. LEXIS 131, *4 (March 29, 1995) (citation omitted) (Section 3-714 "is designed to protect a person who deals with a personal representative when the personal representative acts ultra vires and sells property when such sale

[8] Section 714 was preserved in the new version of the probate code. 18-C M.R.S. § 3-714.

10

is prohibited by the decedent's will."); Unif. Probate Code § 3-714, cmt. (amended 2010) ("This section qualifies the effect of a provision in a will which purports to prohibit sale of property by a personal representative."). Third, even if Section 3-714 ostensibly applies to BHTS in this case, Plaintiffs have adequately pled facts that establish a lack of good faith. At the Motion to Dismiss stage, therefore, BHTS's reliance on Section 3-714 must be denied.

BHTS next argues that to the extent a duty exists in the abstract, it does not apply to BHTS under the terms of the Will. BHTS first points to the "No Duty to Inquire" provision in Article XI(C) of the Will. (Pl's Ex. B. at 11,12). "'A court must interpret the will within the four corners of the document but may use the context of the entire will to interpret specific sections.'" *Estate of Silsby*, 2006 ME 138, ¶ 15, 914 A.2d 703 (*quoting Estate of Wilson*, 2003 ME 92, ¶ 11, 828 A.2d 784). On its face, Art. XI(C) plainly protects persons who are not fiduciaries named in the Will, not persons such as BHTS who are fulfilling the role of a Fiduciary named in the Will.[9] The fact that the "No Duty to Inquire" provision is located in Article XI, and not in the sections describing the duties of trustees, supports the conclusion that "No Duty of Inquiry" provision is not meant to permit the Administrative Trustee to turn a blind eye to whether the Personal Representative properly funded the Trusts. (Pl.'s Ex. B, at 6,8.)

BHTS then points to the Will's "Exculpation of Fiduciaries" clause, Will, Art. XI(D), for the proposition that in the event it had a duty to ensure the Personal Representatives properly funded the Trusts, it is not liable for breach of that duty. (Pl.'s Ex. B at 12). Although exculpation clauses are not per se unenforceable under Maine law, "exculpatory clauses are not favored by the law and are strictly construed against the benefited party." *Martin v. Harris*, No. BCD-CV-14-07, 2015 Me. Bus. & Consumer LEXIS 39, *38-39 (September 9, 2015) (quoting *In re Trusteeship of*

---

[9] Art. XI(C) thus appears to be roughly equivalent to 18-A M.R.S § 3-714.

*Williams,* 591 N.W.2d 743, 747 (Minn. Ct. App. 1999)). *See also* 1-12 Maine Probate Procedure § 12.01 (2017) ("18-B M.R.S. § 1008 gives the first formal statutory approval in Maine to exoneration or exculpatory clauses, but it circumscribes their use and specifies acts which cause such clauses to be unenforceable.") "A term of a trust relieving a trustee of liability for a breach of trust is unenforceable to the that it . . . [r]elieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries[.]" 18-B M.R.S § 1008(1)(A).[10]

In this case, viewing the Complaint in the light most favorable to the Plaintiffs, the Complaint adequately alleges that BHTS acted in bad faith and with reckless indifference in its alleged breaches of trust, particularly once it knew or should have known that the Trusts were improperly funded and that Lindell was to blame. (Pl.'s Compl. ¶¶ 23-48.) If Plaintiffs succeed in proving these allegations at trial, the exculpation clause will be no bar to their recovery given that the allegations are sufficient to support a finding of bad faith. The exculpation clause is thus not grounds to dismiss Count II.

BHTS poses a number of other arguments to deflect potential liability for its alleged breach of the duty to ensure Lindell properly funded the Trusts (e.g. the bifurcated nature of the Trusts, lack of knowledge, lack of damages, etc.), but none of those arguments are persuasive or merit any specific discussion. In this case, BHTS had a fiduciary duty to ensure Lindell properly funded the Trusts. Plaintiffs have more than adequately alleged facts in the Complaint to state a claim that BHTS breached that duty. Whether BHTS is protected by the exculpation clause cannot be

___

[10] Exculpation clauses "inserted as the result of an abuse by the trustee" or "drafted or caused to be drafted by the trustee" are also unenforceable. 18-B M.R.S. § 1008(1)(B), (2). However, as BHTS correctly points out, Plaintiffs' argument that Mr. Lindell caused the drafting or insertion of the exculpation clause into the Will lacks support in the Complaint. *See also id.* § 1008(1),(2).

determined at this stage of the proceeding. Accordingly, BHTS's Motion to Dismiss the breach of fiduciary duty claim based on the Category 1 allegations is denied.

Category 2—Mismanagement of the Trusts

Plaintiffs allege that after Lindell funded the Trusts, BHTS allowed Lindell to misappropriate funds from the Trusts; failed to notify the beneficiaries; attempted to conceal the misconduct; and used monies from the Trust to fund its legal defense. Taking the facts alleged in the Complaint as admitted, and viewing the Complaint in the light most favorable to the Plaintiffs, the Complaint states a claim that BHTS breached its fiduciary duty to impartially administer the Trusts in good faith, as a prudent person would, solely in the interests of the beneficiaries, incurring only costs reasonable in relation to the purposes of the Trusts, and keeping the beneficiaries reasonably informed. *See* 18-B M.R.S. §§ 801-805, 810, 813. As explained above, whether BHTS is protected by the Will's exculpation clause cannot be determined at this stage of the proceeding. Accordingly BHTS's Motion to Dismiss the breach of fiduciary duty claim based on the Category 2 allegations is denied.

**Fraud—Count III**

Count III alleges fraud against BHTS. BHTS argues that these allegations fail to state "the circumstances constituting fraud . . . with particularity[,]" in contravention of M.R. Civ. P. 9(b). BHTS correctly argues that certain of Plaintiffs' allegations do not rise to the level of fraud, such as the allegation that BHTS attempted to have Frederic Poor sign a waiver of all liability. Requesting someone sign a waiver is not fraud, regardless of if otherwise actionable as, for example, a breach of fiduciary duty. *See Cianchette v. Cianchette*, 2019 ME 87, ¶ 20, 209 A.3d 745 (quoting *Drilling & Blasting Rock Specialists, Inc. v. Rheaume*, 2016 ME 131, ¶ 17, 147 A.3d 824) (fraud requires false representation).

13

Nonetheless, the Complaint pleads that BHTS engaged "in a concerted and coordinated effort to hide relevant information and mislead the Plaintiffs . . . ." (Pl.'s Compl. ¶ 95.) Elsewhere, the Complaint similarly alleges in detail how BHTS failed to communicate facts to Plaintiffs that it had a duty to communicate and rather took active steps to conceal the truth of its own misfeasance while under a duty to report. (Pl.'s Compl. ¶¶ 24, 31-34.) While omission of a material fact is generally not proof of a false representation, both exceptions to that general rule apply here: BHTS allegedly actively concealed the truth from Plaintiffs while acting as a fiduciary to Plaintiffs. *McGeechan v. Sherwood*, 2000 ME 188, ¶ 61, 760 A.2d 1068 (quoting *Fitzgerald v. Gamester*, 658 A.2d 1065, 1069 (Me. 1995)) (failure to disclose rises to level of misrepresentation with proof of either (1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative duty to disclose); *see also Glynn v. Atl. Seaboard Corp.*, 1999 ME 53, ¶ 12, 728 A.2d 117 (quoting *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1996)). Thus, these allegations are sufficiently detailed to state a claim for fraud under M.R. Civ. P. 9(b). The Motion to Dismiss the fraud claim in Count III is denied.

**Unjust Enrichment—Count V**

Count V, which alleges unjust enrichment, is pleaded in the alternative and the allegations contained in the Complaint more than adequately describe a situation where Plaintiffs (1) conferred a benefit on BHTS; (2) BHTS had "appreciation or knowledge of the benefit;" and (3) the "acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Howard & Bowie, P.A. v. Collins,* 2000 ME 148, ¶ 13, 759 A.2d 707 (citing *June Roberts Agency v. Venture Properties,* 676 A.2d 46, 49 (Me. 1996)). Accordingly, the Court declines to dismiss Count V.

14

## Punitive Damages—Count VI

Count VI seeks an award of punitive damages as opposed to pleading a cause of action, and BHTS raises no argument for its dismissal in the instant motion. In the absence of argument, the Court declines to dismiss Count VI.

## Negligence—Count VII

In Count VII, Plaintiffs contend that BHTS was negligent in failing to take appropriate action to safeguard the funds of the Frederic J. Poor SNT. The Law Court has characterized the elements of negligence as "a duty owed, breach of that duty, and an injury to the plaintiff that is proximately caused by a breach of that duty." *Stanton v. Univ. of Maine Sys.*, 2001 ME 96, ¶ 7, 773 A.2d 1045, 1049. Plaintiffs allege that BHTS owed a duty to beneficiaries to exercise oversight and reasonable care regarding the funding of the trusts, as well as with regard to disbursements made to Lindell. Plaintiffs further allege that BHTS' failure to exercise their duty proximately caused the theft of hundreds of thousands of dollars from the Frederic J. Poor SNT.

In response, Defendants BHTS contend they possess no duty to examine trust property received from a personal representative (Lindell) and thus without a breaching a duty cannot be held negligent. Because the court concludes BHTS did in fact have a fiduciary duty to ensure Lindell properly funded the Trusts, this is not grounds to dismiss Count VII.

Plaintiffs allegations, if true, are sufficient to establish a cause of action for negligence, and thus the Court declines to dismiss Count VII.

## Tortious Interference—Count VIII

Count VIII pleads one count for tortious interference with economic relations/ expectancy. Tortious interference requires proof of, inter alia, ". . . interference with [a] contract or advantage through fraud or intimidation . . . ." *See Harlor v. Amica Mut. Ins. Co.*, 2016 ME 161, ¶ 12, 150

15

A.3d 793. The law court has extended these protections by recognizing a cause of action for wrongful interference with an expected legacy or gift under a will. *Cyr v. Cote*, 396 A.2d 1013, 1018 (Me. 1979).

BHTS argues that because "fraud or intimidation" is an essential element of that claim, this count must likewise be dismissed based on the Complaint's failure to allege fraud with particularity. Because the Court concludes that Plaintiffs *have* alleged fraud against BHTS with sufficient particularity, this is not grounds to dismiss Count VIII.

**Fraudulent Conveyance—Count IX**

Count IX pleads one count of fraudulent conveyance against BHTS under Maine's Uniform Fraudulent Transfer Act (UFTA). 14 M.R.S.A. §§ 3571-3582. Fraudulent Conveyance laws, such as found in the UFTA, generally aim to protect creditors from fraudulent acts by debtors that would undermine their ability to collect amounts owed to them. *In re Ohio Corrugating Co.*, 91 B.R. 430, 435 (Bankr. N.D. Ohio 1988)

Plaintiffs assert that BHTS committed a transfer with the actual intent to hinder, delay, or defraud the Plaintiffs. (Pl.'s Compl. ¶ 118.) Despite these assertions, Plaintiffs do not specify which transfers were fraudulent, nor do they discuss how BHTS participated in such transfers. Instead, Plaintiffs assert facts stemming from either: 1) Lindell transferring trust assets to himself while acting as Personal Representative; or 2) BHTS' conduct in failing to examine and determine whether the trusts for which they were acting as Trustee were properly funded. These allegations, viewed in the light most favorable to the Plaintiffs, do not amount to the fraudulent transfer of trust assets by BHTS for the purpose of hindering, delaying, or defrauding the beneficiaries of the estate. Thus, the complaint fails to state a claim for fraudulent conveyance and BHTS' motion is granted with respect to Count IX.

16

**Civil Conspiracy—Count X**

BHTS allege a civil conspiracy between all Defendants in Count X. (Pl.'s Compl. ¶¶ 122-126.) BHTS argues that this count fails because the allegations fail to state a claim for "the actual commission of some independently recognized tort[.]" *See Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 8, 708 A.2d 283. The Court concludes above that Plaintiffs have stated claims for multiple torts. BHTS's motion must be denied as to Count X.

**Intentional Infliction of Emotional Distress—Count XI**

BHTS next argues that the allegations are insufficient to state a claim for intentional infliction of emotional distress ("IIED"), which is pleaded in Count XI. (Pl.'s Compl. ¶¶ 127-129.) Indeed, Plaintiffs allege simply that all Defendants "acted in an extreme and outrageous manner and caused emotional distress to Frederic Poor[,]" but there are no allegations of the extent of his emotional distress or even whether any Defendant caused the purported emotional distress intentionally.

"Recent Law Court decisions have endorsed the trial court's role as gatekeeper regarding IIED claims, meaning to evaluate an IIED claim to determine whether the facts alleged could reasonably justify a verdict for the plaintiff." *Temm v. LPL Fin. LLC*, No. BCD-CV-16-14, 2016 Me. Super. LEXIS 68, at *7 (Bus. & Consumer Ct. Apr. 29, 2016). "[I]t is for the Court to determine in the first instance whether the Defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery . . . ." *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 16, 711 A.2d 842 (quoting *Colford v. Chubb Life Ins. Co. of Am.*, 687 A.2d 609, 616 (Me. 1996)). The allegations against BHTS describe behavior that fell far below the standard of care for a fiduciary, but do not allege anything that could be described as "extreme and outrageous." *Cf. Liberty v. Bennett*, No. CV-09-459, 2010 Me. Super. LEXIS 2, *13-15 (Jan. 19, 2010) (declining

17

to dismiss IIED claim because the "court [could] not say as a matter of law that the Defendant's actions definitively were not extreme and outrageous such that they would be regarded as atrocious and utterly intolerable" where the defendant was alleged to have, inter alia, destroyed "the parent/child relationship between the Plaintiff and her father," "took control of the day-to-day lives of the family," "threatened to foreclose a mortgage . . . if [Plaintiff] did not comply with his dictates," "disparaged Plaintiff by screaming at her, calling her names, and telling lies about Plaintiff to other people in her community . . . ."). Furthermore, the Complaint alleges only "emotional distress" on the part of Frederic Poor, and not that it "was so severe that no reasonable [person] could be expected to endure it." *See Curtis v. Porter*, 2001 ME 158, ¶ 10, 748 A.2d 18. In sum, the Complaint does not state a claim for intentional infliction of emotional distress against BHTS. BHTS's motion is granted as to Count XI and Count XI is dismissed with prejudice.

**Motion to Stay in Anticipation of Probate Court's Declaratory Judgment**

Finally, BHTS argues that alternative to dismissing the claims against them, this action should be stayed in anticipation of the Probate Court ruling on a declaratory judgement action BHTS filed in that court prior to being named in this lawsuit. This court, as well as the Hancock County Probate Court have concurrent jurisdiction over the dispute regarding BHTS. Generally, in cases of concurrent jurisdiction, the court given priority is the first to exercise jurisdiction. *Stevens v. Stevens*, 390 A.2d 1074, 1077 (Me. 1978).

The Plaintiff's first complaint is dated January 23, 2019. Shortly thereafter, on March 1, 2019, Plaintiffs amended their complaint to include BHTS. Despite the fact BHTS filed their Hancock Probate Court action in the interim, on February 6, 2019, they were well aware of their likelihood of being joined in this action. This court had already exercised jurisdiction over the

18

Plaintiff's action prior to BHTS filing in Hancock County Probate Court. For these reasons, the court declines BHTS' motion to stay this proceeding.

## CONCLUSION

For all the foregoing reasons, BHTS's motion is granted in part and denied in part. The motion is granted with regards to Count IX (Fraudulent Conveyance), and Count XI (Intentional Infliction of Emotional Distress) and these Counts are dismissed with prejudice as against BHTS. BHTS's motion is otherwise denied.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

So Ordered.


Dated: September 11, 2019                    ___/s/_____
                                             Michael A. Duddy
                                             Judge, Business and Consumer Docket

STATE OF MAINE                           BUSINESS & CONSUMER DOCKET
CUMBERLAND, ss.                          LOCATION:  PORTLAND
                                         DOCKET NO. BCD-CV-18-27


FREDERICK J. POOR,          )
et al.,                     )
                            )
            Plaintiffs      )
                            )
v.                          )            ORDER DENYING LINDELL'S MOTION
                            )            TO AMEND THE ANSWER & PLEADINGS
ROBERT K. LINDELL, JR.,     )
et al.,                     )
            Defendants      )


On August 20, 2019, Defendant Robert K. Lindell, Jr. ("Lindell") filed a "Motion
to Amend Answer to Plaintiff's [sic] Second Amended Complaint and His Answers to
Defendant Gray's And Defendant Latady's Cross-Claims and to Make His Own Cross-
Claim."  For the reasons set forth below, Lindell's Motion is Denied.

BACKGROUND

Plaintiffs initiated this litigation on or about May 4, 2018.  The Complaint was
duly served on Lindell.  On June 18, 2018, Lindell filed a one-sentence Answer denying
all counts and allegations against him.  Thereafter, Plaintiffs successfully pursued an
attachment against Lindell.

In due course, on August 28, 2018, this Court issued Scheduling Order No. 1.
The Scheduling Order established a deadline of October 26, 2018, for joinder of
parties and amendment of pleadings.  Pursuant to Scheduling Order No. 2, that
deadline was extended to March 1, 2019.  The deadline was ultimately extended to

1

April 9, 2019.  In sum, the Court provided seven months for joinder of parties and amendment of the pleadings.

On January 23, 2019, Plaintiffs amended the Complaint, added Defendant Latady, and served the First Amended Complaint on Lindell.  Lindell did not answer the First Amended Complaint.  On April 9, 2019, Plaintiffs amended the Complaint for a second time, added Defendant Bar Harbor Trust Services ("BHTS"), and served the Second Amended Complaint on Lindell.  Lindell did not answer the Second Amended Complaint.  Lindell also did not answer any of the cross claims. And Lindell did not seek to join parties or amend the pleadings during the seven months provided by the Court to do so.

Lindell otherwise has actively participated in the litigation, conducting discovery, filing motions, invoking the Maine Rules of Civil Procedure, and participating in hearings and phone conferences.  The deadline to conduct discovery expired on August 14, 2019.[1]

Lindell now seeks to file an amended answer, adding affirmative defenses, joining a new party, and adding cross claims.  As discussed below, the time for taking all these actions is long since passed.

## ANALYSIS

A party has ten days after service to answer an amended complaint.  M.R. Civ. P. 15(c).  In this case, Lindell failed to answer both the First Amended Complaint and the Second Amended Complaint.  In his Motion, Lindell asserts that he wishes to

---

[1] Although, discovery relating to Bar Harbor Trust Services is currently stayed while the Court considers BHTS's Motion to Dismiss.

amend his answer to the Second Amended Complaint, but Lindell never filed an answer to the Second Amended Complaint. There is nothing to amend.

Moreover, Lindell fails to offer any credible reason to excuse his failure to answer the amended Complaints. Lindell claims during discovery, he "uncovered new evidence and facts after prior deadlines elapsed." As will be discussed in the next section, the Court rejects Lindell's claim of newly discovered evidence. But even if it were the case—which it is not—it would not excuse Lindell's failure to answer the amended Complaints.

Lindell also argues he is "a lay person with no legal training and is acting pro se." The Court has from time to time explained to Lindell that even though he is representing himself, he is nevertheless obligated to comply with the rules of procedure and the rules of evidence. *See Uutinen v. Hall*, 636 A.2d 991, 992 (Me. 1994); *see also Brown v. Thaler*, 2005 ME 75, ¶ 8, 880 A.2d 1113. Indeed, Lindell has shown himself to be knowledgeable about the applicable rules, and has actively litigated this case while representing himself. His status as a self-represented litigant thus offers him no excuse for failure to answer the amended Complaints. His request to now answer the Second Amended Complaint, four months after his answer was due, is denied.[2]

Lindell's Motion also seeks to amend the pleadings, by joining a new party (one of the lawyers representing Plaintiffs), and to add various cross-claims. However, the Court already gave the parties, including Lindell, seven months to amend the

[2] Lindell's attempt to now answer the cross-claims is also denied, as untimely for all the same reasons.

3

pleadings and join parties. Lindell failed to timely take advantage of that opportunity. The deadline to amend the pleadings expired six months ago. Accordingly to Scheduling Order No. 2: "A motion filed after the applicable deadline is untimely and may be denied on that basis, even if not opposed." In this case, Lindell's motion is untimely. The case has already been in litigation for sixteen months. If Lindell's motion were granted at this time it would significantly impair the efficient handling and management of this case.

The Court is mindful that even when leave of Court is required, leave to amend should be freely given when justice so requires. *See* M.R. Civ. P. 15(a). In this case, justice does not so require. Not only is Lindell's Motion significantly untimely, there is no credible basis to support granting the Motion.

Lindell claims that during discovery he uncovered new evidence and facts after prior deadlines elapsed. Lindell says nothing further in support of this claim, and fails to explain or elaborate on the claim. Contrary to his claim, an inspection of the proposed amended answer, and the documents attached thereto, demonstrate that the "new" evidence and facts on which he relies were wholly or substantially known to Lindell prior to the litigation.[3] Accordingly, Lindell's motion to amend the pleadings is denied.

CONCLUSION

---

[3] Footnote 2 to Plaintiffs' Opposition provides a useful description of the history and origins of the so called "new" evidence.

For all these reasons, Lindell's Motion to Amend Answer to Plaintiff's [sic] Second Amended Complaint and His Answers to Defendant Gray's And Defendant Latady's Cross-Claims and to Make His Own Cross-Claim is DENIED.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

September 5, 2019.


_____/s/_____
Michael A. Duddy
Judge, Business and Consumer Docket

5

STATE OF MAINE                    BUSINESS & CONSUMER DOCKET
CUMBERLAND, ss.                   LOCATION: PORTLAND
                                  DOCKET NO. BCD-CV-18-27✓


FREDERICK J. POOR,          )
ET AL                       )
                            )
          Plaintiffs        )
                            )
v.                          )        ORDER DENYING MOTION TO
                            )        RELEASE ATTACHED FUNDS
ROBERT K. LINDELL, JR.,     )
ET AL                       )
          Defendants        )


On May 4, 2018, the District Court granted the Plaintiffs' Motion for Ex Parte

Attachment and Trustee Process, and approved attachment and attachment on

trustee process against Defendants in the amount of $3,000,000. On June 12, 2018,

Defendant Robert Lindell filed a Motion to Stay. On June 20, 2018, Defendant

Barbara Gray filed a Motion to Dissolve Attachment, which included the Affidavit of

Barbara Gray. Defendant Robert Lindell did not file any such motion or affidavit

seeking dissolution or modification of the attachment. On July 10, 2018, this case

was accepted for transfer to the Business and Consumer Docket. A hearing was held

on August 24, 2018 (at which Lindell appeared, representing himself), following

which the Court denied Lindell's Motion to Stay, and granted Gray's Motion to

Dissolve Attachment.

On August 29, 2018, Lindell filed a Motion to Release Attached Funds to Pay

for Criminal Defense Attorney. Lindell did not include an affidavit with his Motion.


1

Plaintiffs timely opposed the Motion, Lindell replied, and Lindell's Motion to Release is now fully briefed.

Lindell has filed what he calls a Motion to "Release," but he has not previously or currently actually moved to dissolve or modify the attachment. Thus the attachment is in full force and effect. M.R. Civ. P. 4A does not provide a mechanism to request or order release of funds properly attached. Since Rule 4A does not contemplate such a proceeding, Lindell is not entitled to a hearing,[1] and his Motion is denied.

Even if Lindell's Motion is construed as a Motion to Dissolve or Modify, the result is no different. In order to be entitled to a hearing under Rule 4A(h), a Defendant must include with his Motion an affidavit challenging the findings of the ex parte attachment order. M.R. Civ. P. 4A(h). A Defendant's failure to challenge by affidavit means the Plaintiff has no burden to justify any finding in the ex parte order, which in turn means there is no reason or purpose for holding a hearing. See Beesley v. Landmark Realty, Inc., 464 A.2d 936, 937 (Me. 1983)(by failing to challenge by affidavit the findings of the ex parte order, defendant was precluded from challenging the findings at the hearing on the motion to dissolve); see also Levine v. Keybank Nat'l Ass'n, 2004 ME 131, ¶¶ 11 & 12, 861 A.2d 678, 682 (defendant failed to challenge by affidavit any of the findings in the ex parte order); Sanders v. Sanders, 1998 ME 100, ¶ 7, 711 A.2d 124, 126-127 (defendant did not challenge the findings by affidavit, therefore plaintiff had no burden to justify them).

---

[1] The Court may in its discretion rule on a motion without a hearing. M.R. Civ. P. 7(b)(7). Since there are no reasonable grounds for the Court to consider granting Lindell's Motion, the Court decides the motion without a hearing.

2

Further, even if Lindell's Motion is itself construed to be an affidavit or declaration, which it is not, the result is still no different. The facts alleged in Lindell's Motion to Release are extraneous to the findings justifying the ex parte order of attachment. The legal argument contained in the Motion also fails to address or challenge any of the findings on which the ex parte order is based. For all of these reasons, Lindell is not entitled to a hearing, and his Motion is denied.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

October 1, 2018.

_____
Michael A. Duddy
Judge, Business and Consumer Docket

Entered on the Docket: 10-1-18
Copies sent via Mail___ Electronically ✓

MR. LINDELL

3